The COMMISSIONER OF REVENUE, Respondent,

v.

Charles E. and Doris STAMP, Relators.

No. 50689.

Supreme Court of Minnesota.

Aug. 29, 1980.

Best & Flannagan, Minneapolis, for relators.

Warren Spannaus, Atty. Gen., St. Paul, for respondent.

WAHL, Justice.

Certiorari to the Tax Court to review a decision affirming an order of the commissioner of revenue which imposed additional income tax on Charles E. and Doris Stamp for the 1975 tax year. The sole issue on appeal is whether the Tax Court erred by concluding that taxpayers were Minnesota residents for income tax purposes during the relevant time period. We affirm.

Taxpayers had been Minnesota residents since 1943 when Charles Stamp accepted employment as a pilot for Northwest Orient Airlines assigned to the Minneapolis-St. Paul station but had planned for some time to move to Florida once their children were grown. In the late fall of 1974 they purchased a condominium in Florida for $30,000. They took possession on December 30, 1974, furnished the condominium with items purchased in Florida, and resided there until late April or early May 1975 when they returned to Minnesota. During their stay in Florida taxpayers continued to own a home near Lake Minnetonka which had an assessed value of $45,460. In January 1975 they applied for Florida homestead classification of their condominium and notified Minnesota officials that they were no longer homesteading their Minnetonka property. Taxpayers rented out their Minnesota home for the first 3 months of 1975, receiving as rental payment of utilities and maintenance costs. Taxpayers remained in Min-

nesota from May until December 1975 but did not lease out their Florida condominium in their absence. During the whole of 1975 Doris Stamp spent approximately 7 months in Minnesota and 5 in Florida; Charles Stamp spent approximately 115 days in Minnesota, 130 days in Florida, and 120 days working and flying in other states and countries.

Throughout 1975 taxpayers retained financial ties with Minnesota. They continued their principal checking and savings accounts at Wayzata Bank and Trust and obtained a loan from that institution in December 1975. Charles Stamp also kept an account with the Northwest Airlines Credit Union in Minnesota. Outside Minnesota taxpayers maintained an investment account with a Boston financial institution and they opened a savings account in Florida. Doris Stamp continued to maintain charge accounts with the Minneapolis Dayton's and Powers stores and did not open accounts at Florida stores. Taxpayers' cancelled checks reveal numerous payments to Minnesota payees, including larger sums for utilities, newspapers and medical expenses than expended in Florida.

Taxpayers also maintained social affiliations in Minnesota. They were full resident members of the Minneapolis Golf Club throughout 1975 and incurred bills there of $1,772.10. They also joined a Florida golf club and social organization where they spent $153.01. Taxpayers continued membership in a family flying club and, although they did not participate in the club's activities in 1975, they paid approximately $200 to the club. Doris Stamp periodically attended the Wayzata Community Church and contributed $322. She also attended church in Florida.

During 1975 taxpayers owned two automobiles, one located and licensed in Minnesota and one located and licensed in Florida. Taxpayers obtained Florida driver's licenses in January 1975 and allowed their Minnesota licenses to expire.

Taxpayers last voted in Minnesota in 1974. In January 1975 they registered to vote in Florida and voted there in local elections.

Charles Stamp testified that his intention in buying the Florida condominium was to transfer his domicile from Minnesota to Florida. He stated that his reasons included income tax advantages, as well as climate and opportunity to play more golf. Late in 1974 he contacted his employer and filled out forms required to stop the withholding of Minnesota income taxes from his paycheck.

Pursuant to request of the Minnesota Department of Revenue, taxpayers filed a 1975 income tax return in 1977. They claimed that they were not Minnesota residents in 1975. The department determined otherwise and, following unsuccessful negotiations, the commissioner issued an order assessing additional tax, penalty and interest. Taxpayers appealed to the Tax Court, which affirmed the commissioner's order.

■ Minn.Stat. § 290.17 (1978) provides that the income of resident taxpayers is assigned to Minnesota for income tax purposes. Minn.Stat. § 290.01, subd. 7 (1978) defines "resident" as "any individual domiciled in Minnesota and any other individual maintaining an abode therein during any portion of the tax year who shall not, during the whole of such tax year, have been domiciled outside the state." In *Miller v. Comm'r of Taxation*, 240 Minn. 18, 19, 59 N.W.2d 925, 926 (1953) we stated that " '[d]omicile' means bodily presence in a place coupled with an intent to make such place one's home." Since the bodily presence element was undisputed in *Miller*, our discussion focused on intent. We stated that where there are definite statements of intent to make a new abode one's home, the trier of fact may consider the acts and circumstances of that person in evaluating the sincerity of the announced intent.

Taxpayers argue that the Tax Court deviated from *Miller* by requiring them to prove not only physical presence in Florida coupled with intent to make Florida their

home but also abandonment of their Minnesota domicile. While language in the Tax Court's memorandum arguably suggests confusion of the legal standard and employment of too stringent proof requirements with respect to these taxpayers, the Tax Court's conclusion of law reveals that the correct reasoning was applied: "Appellants did not abandon their domicile in Minnesota in the year 1975. Hence we conclude that the appellants' acts contradict their stated intention." Since an existing domicile is presumed to continue until a new one is established, and a new domicile is proved by showing physical presence coupled with intent to make a home, no separate question of abandonment enters into the legal analysis. To attribute such reasoning to the Tax Court would be unwarranted where the record indicates that it simply used the term "abandon" to describe a factual determination that taxpayers' acts contradicted their stated intent to change their domicile and, in fact, established that they intended to retain their existing one.

Since we read the Tax Court's order as determining that taxpayers failed to prove intent to make Florida their home, we must decide whether that determination is supported by the record. Both parties focus their discussion of this issue on the factual similarities and differences between this case and *Miller*. While *Miller* is instructive insofar as it indicates the type of factors relevant to intent, it does not establish a formula for effecting a change of domicile. Each case turns on its own peculiar facts and circumstances. In this admittedly close case there was evidence that taxpayers purchased a condominium in Florida, exercised certain rights of Florida residents, including obtaining driver's licenses, homesteading real estate, and voting, established social connections there, and expressed the intent to change their domicile from Minnesota to Florida. There was also evidence, however, that taxpayers actually resided in their Minnesota home for most of 1975, that their principal financial matters were handled in Minnesota and that they maintained significant social associations in Minnesota. Based upon this evidence the Tax Court permissibly found that taxpayers' Minnesota-related activities contradicted their stated intent to make Florida their home. Since such intent is essential to effect a change in domicile, taxpayers remained Minnesota domiciliaries for income tax purposes in 1975.

Affirmed.