Kakambi NAGARAJA, et al., Relators,

v.

COMMISSIONER OF REVENUE,
Respondent.

No. C1–83–572.

Supreme Court of Minnesota.

June 22, 1984.

Rehearing Denied Aug. 30, 1984.

Kathryn J. Sedo, Minneapolis, for relators.

Hubert H. Humphrey, III, Atty. Gen., Thomas K. Overton, Sp. Asst. Atty. Gen., Dept. of Revenue, St. Paul, for respondent.

AMDAHL, Chief Justice.

This case requires us to construe the Property Tax Refund Act, Minn.Stat. §§ 290A.01–.23 (1982 & 1983 Supp.). More specifically, we must determine whether the Tax Court erred in holding that relators are not "claimants" under Minn.Stat. § 290A.03, subd. 8 (1982 & 1983 Supp.).

Relators were denied property tax refunds under chapter 290A of the Minnesota Statutes, the Property Tax Refund (Act), for the tax year 1979. Relators filed time-

ly protests of the denial with the Department of Revenue in November of 1980. Subsequently, in July of 1981, the Department extended the denial of property tax refunds to include previously allowed and paid refunds for the years 1976, 1977 and 1978. The Commissioner of Revenue consolidated all the protests and issued a final order on October 15, 1981, which denied all refunds granted or requested from 1976 to 1980. The relators filed timely appeals to the Minnesota Tax Court.

In February 1982, the Tax Court held a pretrial and shortly thereafter (on March 10, 1982) transferred the case to Ramsey County District Court. The case was transferred because it was thought that the Tax Court did not possess original jurisdiction to decide the constitutional questions raised by relators.

On March 31, 1982, the Ramsey County District Court transferred the case back to the Tax Court for trial on all issues pursuant to Minn.Stat. § 271.01, subd. 5 (1980). The Commissioner objected to the transfer of the case back to the Tax Court.[1]

On June 30, 1982, a hearing on the merits was held and on March 3, 1983, after extensive post-trial briefing by the parties, the Tax Court issued its Findings of Fact, Conclusions of Law, Order for Judgment and Memorandum. On April 25, 1983, relators filed a petition for a writ of certiorari with this court and the writ was issued the same day.[2]

The essential facts in this case are undisputed and simple. The relators are all non-immigrant aliens[3] who lawfully entered the United States and State of Minnesota between 1974 and 1977. Four of the relators entered this country specifically to pursue graduate education at the University of Minnesota. Relator Tafesse came to

---

1. By statute the Tax Court is an independent agency of the executive branch. *See* Minn.Stat. § 271.01, subd. 1 (1982). Under article III of the Minnesota Constitution the powers of the government are separated into three specific branches: executive, legislative and judicial. "No person or persons belonging to or constituting one of these departments shall exercise any of the powers properly belonging to either of the others except in the instances expressly provided in this constitution." Minn.Const. art. 3, § 1. *Hence, a separate executive agency is precluded from exercising judicial powers.*

Minn.Stat. § 271.01, subd. 5 (1982), however, vests the Tax Court with statewide jurisdiction to be "the sole, exclusive, and final authority for the hearing and determination of all questions of law and fact arising under the tax laws of the state * * *." *Id. See also* Minn.Stat. § 271.05 (1982).

In *Matter of McCannel*, 301 N.W.2d 910 (Minn.1980), and *Guilliams v. Commissioner of Revenue*, 299 N.W.2d 138 (Minn.1980), this court clarified the extent of the Tax Court's powers to decide constitutional issues. *McCannel* holds that the "tax court * * * has jurisdiction to determine the constitutionality of tax statutes when, in the first instance the constitutional issue is raised in the district court before the case is transferred to the tax court." *Guilliams*, 299 N.W.2d at 139 n. 1. In the instant case the Commissioner, noting the Tax Court's lack of original jurisdiction to decide constitutional issues, moved to have the case transferred to district court. The Tax Court outlined the constitutional issues in its order transferring the

case to Ramsey County. Consequently, the district court was aware of the constitutional issues when it transferred the case back to the Tax Court. Hence, jurisdiction is present under *McCannel* and *Guilliams, supra.*

2. Rule 116.01 of the Minnesota Rules of Civil Appellate Procedure governs review of Tax Court decisions by certiorari. Rule 116.01 provides in part:

Supreme Court review of * * * decisions of the Tax Court * * * may be had by securing issuance of a writ of certiorari within 30 days after the date the party applying for the writ was served with written notice of the decision sought to be reviewed, *unless* an applicable statute prescribes a different period of time.

Minn.R.Civ.App.P. 116.01 (emphasis added). Minn.Stat. § 271.10 governs review of Tax Court decisions by the supreme court and provides a 60-day period for petition for and issuance of a writ of certiorari. Minn.Stat. § 271.10, subd. 2 (1982). Relators' appeal, therefore, is properly before this court.

3. Nonimmigrant status as an alien is governed by 8 U.S.C. § 1101(a)(15) (1982). An F-1 student visa contemplates:

An alien having a residence in a foreign country which he has no intention of abandoning, who is a bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study * * *.

8 U.S.C. § 1101 subd. a(15)(F)(i) (1983).

the United States for open heart surgery. Subsequent to surgery and while he continued treatment for his heart condition, he enrolled in a computer graduate program at the University of Minnesota. All of the relators, except Tafesse, worked at the University of Minnesota as research or teaching assistants and paid federal, Minnesota and social security taxes on all of their income.

Dr. Nagaraja is a native of India who enrolled in the Ph.D. program in Veterinary Microbiology at the University of Minnesota in 1974. He completed his degree in 1979 and was appointed a research fellow at the University. While attending the University, he paid in-state tuition.

After being appointed as a research fellow in 1979, Dr. Nagaraja received a training visa and labor certificate allowing him to work full time. He paid income and social security taxes. Later, he applied for and was granted permanent resident status and plans to become a United States citizen upon completion of the naturalization process.

Nagaraja has a valid Minnesota driver's license and owns an automobile which required payment of Minnesota sales tax upon purchase of the vehicle. He intends to remain in Minnesota and to make it his permanent home.

For the years 1977 through 1979, Dr. Nagaraja applied for and received a property tax refund as a renter. In 1980 he received a letter stating that all of his refunds were disallowed and requiring him to pay back the previous refunds.

In 1976 relator Charmchi enrolled in the mechanical engineering Ph.D. program at the University of Minnesota. He is a citizen of Iran but because of political and professional reasons, does not plan to return to his native country. Currently, he lives in Farmington, Massachusetts, where he moved in 1979 when unable to secure employment in Minnesota.

Like Dr. Nagaraja, Charmchi has a Minnesota driver's license and owns an automobile purchased in Minnesota. Similarly, he paid in-state tuition while attending the University, worked as a research assistant because of visa restrictions and paid Minnesota and federal taxes on the income he earned at the University. Charmchi also received property tax refunds (renters' credit) for 1976, 1977, 1978 and was denied a property tax refund in 1979. The Commissioner of Revenue disallowed the previously paid refunds for the years 1976 through 1978 and requested that the refunds be paid back with interest.

Charmchi presently is in this country on a student visa with practical training status. If his present employer is satisfied with his work, then the company will apply for permanent residency status for him. He also hopes to become a U.S. citizen.

Relator Lee is a citizen of Taiwan. Lee entered this country in 1975 to pursue a Ph.D. in Pharmaceutics at the University of Minnesota. She worked as a research assistant while attending graduate school and paid both Minnesota and federal income taxes. This was her only source of income.

Lee married another graduate student from Taiwan while at the University. Her husband teaches at Penn State University where she plans to move upon completion of her Ph.D. Both Lee and her husband would like to receive permanent resident status and make the United States their home.

Lee filed state income tax returns from 1976 on and received property tax refunds until 1980 when her refund was denied. When the state denied Lee's property tax refund in 1980, it also requested that she pay back all previous refunds.

Relator Tehrani is a citizen of Iran who enrolled in the mechanical engineering Ph.D. program at the University of Minnesota in 1976. He received his degree in 1982 and currently is employed as a consultant at the University of Sherbrook, Quebec, Canada. While at the University of Minnesota, he paid in-state tuition and worked as a research assistant from March 1976 until December 1981. Tehrani paid Minnesota and federal income tax on the income he received while he lived in Minne-

sota. Tehrani moved to Canada after completing his Ph.D. because he was unable to secure employment in Minnesota. He has a Minnesota driver's license and owned an automobile in Minnesota from 1978 through 1982.

Tehrani received property tax refunds, as a renter, in 1976, 1977 and 1978; in 1980 the Commissioner of Revenue disallowed all his previous refunds and denied a refund for 1979.

Tafesse is a citizen of Ethiopia. After Tafesse's open-heart surgery, his physician wrote the Immigration and Naturalization Service (INS) and recommended that Tafesse be allowed to remain in this country for further medical treatment. Meanwhile, Tafesse started studying computer science at the University. Mr. Tafesse has received student loans from the State of Minnesota and pays in-state tuition. He has no present plans to return to Ethiopia. He wishes to become a permanent resident of the United States. He also has a Minnesota driver's license and purchased an automobile in Minnesota.

While attending the University, Tafesse did assembly line work at Control Data. He paid Minnesota and federal income tax and did not receive any economic aid from his family. He applied for and received, as a renter, property tax refunds in 1977 and 1978. In 1980, his claim for a 1979 property tax refund was denied and his earlier refunds were disallowed.

 Review of Tax Court determinations is generally limited to determining whether there is sufficient evidence to support the Tax Court's decision. *Miller's Estate v. Commissioner. of Taxation*, 240 Minn. 18, 20, 59 N.W.2d 925, 926 (1953).

*See also Commissioner of Revenue v. Stamp*, 296 N.W.2d 867, 870 (Minn.1980) (court must determine whether Tax Court's decision is supported by the record). Although review of questions of fact is limited, this court has plenary power with respect to questions of law.

In 1975, the legislature enacted what is currently called the State of Minnesota Property Tax Refund Act (hereinafter "the Act"). State of Minnesota Income-Adjusted Homestead Credit Act, c. 437, art. 1, §§ 1–21, 1975 Minn.Laws 1573–81 (currently codified at Minn.Stat. ch. 290A (1982)). The express purpose of the Act was to "provide property tax relief to certain persons who own or rent their homesteads." Minn.Stat. § 290A.02 (1982). *See Murphy v. Hiniker*, 261 N.W.2d 836 (Minn.1978)

> The legislative intent in enacting the Income-Adjusted Property Tax Credit Act [the Act] was to shift property tax burdens according to a family's ability to pay * * *. Furthermore, it is clear that the overall purpose is equalization, not only economic and social, but geographical.

*Id.* at 840. Since its enactment the Act has been amended in every legislative session.[4]

Under the Act persons satisfying the definition of claimant are entitled to a credit.[5] In the original Act a claimant was "a person who filed a claim authorized by sections 1 to 21 and who was domiciled in this State during the calendar year for which the claim for relief was filed." Act, ch. 437, § 3, 1975 Minn.Laws 1575. The Act also included part-time Minnesota residents within its definition of claimant.[6] Throughout the Act's history, the basic definition of claimant has remained the same: " 'claimant' means a person * * * who filed a claim

---

**4.** *See, e.g.,* Act of June 14, 1983, ch. 342, art. 4, §§ 1–16, 1983 Minn.Laws 2243–56 (amending various sections of ch. 290A); Act of March 22, 1982, ch. 523, art. 1, § 63, 1983 Minn.Laws 749 (amending Minn.Stat. § 290A.03, subd. 3 (Supp. 1981)).

**5.** "A creditor shall be allowed each claimant in the amount that property taxes payable or rent constituting property taxes exceed the percentage of the household income of the claimant

specified in subdivision 2 in the year for which the taxes were levied or in the year in which the rent was paid." Minn.Stat. § 290A.04, subd. 1 (1982).

**6.** "In the case of a part year resident, the income and rental reflected in this computation shall be for the period of Minnesota residency only." Act, ch. 437, § 3, 1975 Minn.Laws 1575 (codified at Minn.Stat. 290A.03, subd. 8 (1976)).

\* \* \* and who was domiciled in this state during the calendar year for which the claim for relief was filed." Minn.Stat. § 290A.03, subd. 8 (1982).[7]

Under the Act, a person must have been domiciled in the State of Minnesota during the tax year to which the claim for relief relates. Domicile, as the Commissioner argues, is critical. The domicile requirement, although initially unambiguous, becomes less clear when juxtaposed with the part-time resident requirement.

Domicile is a protean concept that permeates the law.[8] Generally, "[d]omicile means bodily presence in a place coupled with an *intent* to make such place one's home." *Miller's Estate*, 240 Minn. at 19, 59 N.W.2d at 926. (Emphasis added.) *See Stamp*, 296 N.W.2d at 869–70. The "bodily presence" element of domicile is not in dispute in the instant case; rather, the element of intent—a factual question—is disputed.

In *Toll v. Moreno*, 284 Md. 425, 397 A.2d 1009 (1979), domicile was discussed at length. The *Toll* decision focused on a person's actions rather than stated intent. *Id.* at 1015–16. Domicile is generally determined by where a person lives and votes. *Id.* at 1016. Because relators in the instant case are precluded from voting, other factors such as payment of taxes, mailing address, licenses, banking, membership in organizations and a variety of other factors indicating intent are examined. *Id.*

The Commissioner asserts that relators are incapable of having an intent to make Minnesota their home because of their visa status. In order to obtain F–1 student visa status, a nonimmigrant alien must sign a form stating that he has "a residence in a foreign country which he has no intention of abandoning \* \* \*." 8 U.S.C. § 1101 subd. a(15)(F)(i) (1982). Coupled with this statement of intent and the principle that "an existing domicile is presumed to continue until a new one is established," *Stamp*, 296 N.W.2d at 870, the Commissioner avers that relators are precluded from ever establishing their domicile in Minnesota until their INS status changes. Although the argument is persuasive, it is not conclusive.

■ The record is replete with evidence indicating an intent on the part of relators to make Minnesota their home. The Commissioner relies solely on relators' stated intent. The *Stamp* case clearly established that a taxpayer's actions can contradict his stated intent and implied that actions rather than stated intentions may be more significant in determining the intent required for domicile. *Stamp*, 296 N.W.2d at 870. Furthermore, the *Miller* decision "emphasized that it is the intention to abandon the former dwelling place as a *home* that is the important criterion." 240 Minn. at 21, 59. N.W.2d at 927 (emphasis in original).

The issue raised by the *Toll* case is nearly identical to that posed by the instant case. *Toll* responded to the following question certified to the Maryland Court of Appeals by the United States Supreme Court:

> Are persons residing in Maryland who hold or are named in a visa under 8 U.S.C. § 1101(a)(15)(G)(iv) (1976 ed.), or who are financially dependent upon a

---

7. Numerous qualifications and exceptions have been added to this basic definition, but none are relevant in the instant case. Moreover, the definition has retained the part-year resident language, *see supra*, note 6, since the Act's inception.

8. The issue of domicile arises in a variety of legal contexts: divorce, service of process, qualification for voting, administration of estates, etc. Notwithstanding its ubiquitous nature, the meaning of domicile and the basic principles for determining domicile do not vary. *See El-kins v. Moreno*, 435 U.S. 647, 669 n. 29, 98 S.Ct. 1338, 1351 n. 29, 55 L.Ed.2d 614 (1978), *citing*

Restatement (Second) of Conflict of Laws § 11, Comment o, at 47 (1971). *See also Toll v. Moreno*, 284 Md. 425, 437–42, 397 A.2d 1009, 1015–17 (1979).

*Toll v. Moreno*, 284 Md. 425, 397 A.2d 1009 (1979), is the response of the Maryland Court of Appeals to a question certified by the United States Supreme Court in *Elkins v. Moreno*, 435 U.S. 647, 98 S.Ct. 1338, 55 L.Ed.2d 614 (1978). *See infra* note 9 and accompanying text. The final decision, after the certification, was *Toll v. Moreno*, 458 U.S. 1, 102 S.Ct. 2977, 73 L.Ed.2d 563 (1982). *See infra* note 10 and accompanying text.

person holding or named in such a visa, incapable as a matter of state law of becoming domiciliaries of Maryland?[9]

*Toll,* 397. A.2d at 1009–10, *quoting Elkins v. Moreno,* 435 U.S. 647, 669, 98 S.Ct. 1338, 1351, 55 L.Ed.2d 614 (1978). The Maryland Court of Appeals held that "nothing in the general Maryland law of domicile renders G–4 visa holders, or their dependents, incapable of becoming domiciled in this State * * *." 397 A.2d at 1019.[10]

Under *Toll* the Commissioner's conclusion must be set aside. Other jurisdictions have resolved the issue similarly. *See, e.g., In Re Marriage of Pirouzkar,* 51 Or.App. 519, 626 P.2d 380 (1981) (federal immigration law does not prevent states from allowing a nonimmigrant alien to establish domicile for purpose of personal jurisdiction); *Bustamante v. Bustamante,* 645 P.2d 40 (Utah 1982) (visa status is not necessarily controlling for purpose of establishing domicile for divorce).

■■ In conclusion, relators' intent to establish Minnesota as their domicile is not negated by their visa status and that status does not of itself exclude relators from the definition of claimant under Minn.Stat. § 290A.03, subd. 8 (1982). The record does contain other evidence sufficient to support

a conclusion that relators are Minnesota domiciliaries.[11]

We therefore hold that the relators' visa status does not control intent for purposes of determining domicile. We reverse and remand this case to the Tax Court for a factual determination as to whether relators had, at relevant times, the requisite intent to establish domicile in Minnesota.

Reversed and remanded.

---

9. A G–4 visa status is included within the same classification as an F–1 or F–2 visa status—nonimmigrant alien. *See* 8 U.S.C. § 1101 subd. (a)(15) (1982). Consequently, the visa holders in *Toll* are nearly identical to those in the instant case.

10. The fact that the United States Supreme Court certified this question to the Maryland Court of Appeals indicates that the Court does not view INS status as preemptive of state domiciliary law. In *Toll v. Moreno,* 458 U.S. 1, 102 S.Ct. 2977, 73 L.Ed.2d 568 (1982), the United States Supreme Court made it clear that INS status is not wholly determinative of state domiciliary law. We read *Toll* to establish two principles. First, INS status does not control whether a resident alien can establish domicile under state law. Second, and collateral to the instant case, *Toll* held that because of federal tax regulations created for G–4 resident aliens, the University of Maryland's policy concerning tuition rates violated the supremacy clause. This second principle is not involved in this case. The *Toll* court held:

In sum, the Federal Government has not merely admitted G–4 aliens into the country; it has also permitted them to establish domicile and afforded significant tax exemptions on organizational salaries. In such circumstances, we cannot conclude that Congress ever contemplated that a State, in the operation of a university, might impose discriminatory tuition charges and fees solely on account of the federal immigration classification. We therefore conclude that insofar as it bars domiciled G–4 aliens (and their dependents) from acquiring in-state status, the University's policy violates the Supremacy Clause. 458 U.S. at 17, 102 S.Ct. at 2986.

11. Because we decide that visa status is not controlling for purposes of determining intent to establish domicile, we do not address relators' claim that the Commissioner's denial of their property tax refund violates the equal protection clause.