**STATE of Minnesota, Respondent,**

v.

**Randall Wayne ENYEART, Appellant.**

No. A03–360.

Court of Appeals of Minnesota.

March 23, 2004.

Mike Hatch, Attorney General, St. Paul, MN; and Amy Klobuchar, Hennepin County Attorney, Jean E. Burdorf, Assistant County Attorney, Minneapolis, MN, for respondent.

Robert D. Sicoli, Law Offices of Robert D. Sicoli, Ltd., Minneapolis, MN; and Sarah M. Aho, Gislason & Hunter, LLP, Minnetonka, MN, for appellant.

Considered and decided by LANSING, Presiding Judge, PETERSON, Judge, and HALBROOKS, Judge.

## OPINION

LANSING, Judge.

Randall Enyeart was convicted for knowingly filing fraudulent tax returns, willfully evading income taxes, and intentionally evading motor-vehicle taxes, on the theory that he sought to avoid taxation by fraudulently creating the appearance that he was a resident of Alaska. On appeal from the judgment of conviction, Enyeart challenges the constitutionality of Minn. R. 8001.0300 (2001), the propriety of the jury instructions, the determination that federal law does not preempt Minnesota's method of calculating days spent in the state, and the admission of Minn. R. 8001.0300 into evidence. Because we conclude that the domicile rule is neither unconstitutionally vague nor preempted by federal law and that the district court did not abuse its discretion either in instructing the jury or in admitting the domicile rule into evidence, we affirm.

## FACTS

Randall Enyeart began working as a commercial pilot for Northwest Airlines (NWA) in 1979. He later married, had two children, and moved to Minnetonka. His children were enrolled in Minnetonka public schools, and he claimed Minnesota residency on his federal and state income-tax returns from 1993 until 1997.

In August 1997, Enyeart and his wife separated. Enyeart remained in the family's Minnetonka home, and his former wife and children moved to Deephaven. In December 1997, Enyeart notified NWA electronically that he had changed his residency to Alaska effective September 1997. But he continued to live in the Minnetonka house—and to homestead and insure it as a residence—until the house was sold in April 1999.

In early 1998, Enyeart completed a client-information form for accountant Linda Gasch, in which he indicated that he had moved his residence to Anchorage, Alaska. Relying on that information, Gasch listed Enyeart in his 1997 income-tax return as a part-year resident of Minnesota and a part-year resident of Alaska.

In April 1998, Enyeart filed a dissolution petition in which he indicated that he resided at the Minnetonka address and had been a Minnesota resident for not less than 180 days immediately preceding the commencement of dissolution proceedings. The dissolution judgment awarded Enyeart joint legal and physical custody of his two sons.

In November 1998, Enyeart applied for an Alaska driver's license. A certified record from Alaska indicates that Enyeart surrendered his Minnesota license. But according to Minnesota records, his license was not surrendered. Enyeart's 1995 Ford Expedition remained in Minnesota and was insured on the premise that it was garaged in Minnetonka. Also in November 1998, Enyeart registered to vote in Alaska. Up to that time, Enyeart had been registered to vote in Minnesota.

In connection with his 1998 state returns, Enyeart told Gasch that his residence continued to be in Alaska and that he was now flying international flights only. Based on that information, his Minnesota income taxes amounted to only $509. Had he claimed Minnesota residency in 1998, his state income tax would have

been $14,471. Enyeart also claimed a homestead credit on his Minnetonka house for 1998 and received a $906 rebate. To be eligible for this property-tax rebate, the property must be (1) homesteaded, and (2) the taxpayer's "principal place of residence."

In April 1999, Enyeart purchased a townhouse in Shorewood, Minnesota. Enyeart paid the earnest money for the townhouse with a check from his NWA credit union bearing his Minnetonka address. And he bought homeowner's insurance. On May 3, Enyeart filed a homestead application for the townhouse, in which he indicated that he intended to occupy the property. Two weeks later, he filed a relative homestead application, listing his brother as the occupant and himself as the non-occupying owner. Enyeart listed the Minnetonka house as his current address.

Enyeart also executed a statement of occupancy in connection with a mortgage submitted for recording, indicating that he planned the townhouse to be his "principal residence." In an affidavit prepared by the title company for execution at closing, Enyeart indicated that he had lived at the Minnetonka address for the past ten years. And in a residential-loan application, Enyeart declared that he was the sole owner of the townhouse and that the townhouse was to be his principal residence. At closing, he provided the mortgage company with a copy of his Minnesota driver's license.

In September 1999, Enyeart's flight base moved from Minneapolis to Detroit, Michigan. Later that month, he applied for an automobile loan through the NWA credit union. In the application, Enyeart listed the townhouse as his residence and stated that he had lived there for four months. In October 1999, he applied for a home-equity loan that had an occupancy requirement. Enyeart used the townhouse as security.

In November 1999, Enyeart bought a 2000 Ford Expedition from a dealer in Buffalo, Minnesota, and paid with a check bearing his Shorewood address. The purchase agreement listed a Minnesota mailing address and Minnesota telephone numbers. Enyeart paid no sales tax on the vehicle because he told the dealer that he planned to transfer title to Alaska. Had he claimed Minnesota residency, the tax due on the vehicle would have been $1,422.18. Enyeart registered the Ford Expedition in Alaska in January 2000.

Even though he claimed Alaska residency and was based out of Detroit, Enyeart continued to have his NWA pay stubs and withholding information sent to the Minneapolis/St. Paul base during 1999 and 2000. Enyeart did not file a 1999 Minnesota income-tax return, claiming that he was an Alaska resident. Had he claimed Minnesota residency in 1999, he would have had to pay $11,454 in state income taxes.

In January 2000, Enyeart told Hennepin County officials that he had been a Hennepin County resident for the past ten years and had resided at the Shorewood address for the past nine months. In February 2000, he stated under oath that he lived at the Shorewood address and had lived there since April 1999. And in September 2000, he signed and filed emergency-notification cards with his sons' school that listed the Minnetonka address and Minnesota telephone numbers as his contact information.

In February and August 2000, Enyeart listed the Shorewood address in his application for a medical certificate of fitness, which he needed to maintain his commercial-pilot's license. Before then, he had used the Minnetonka address. Enyeart listed his Alaska address for the first time in February 2001. In December 2000, Enyeart applied for a second home-equity

loan. Once again, Enyeart listed the Shorewood address as his current address and used the townhouse as security.

In his 2000 federal income-tax return, Enyeart continued to claim Alaska as his state of residence. Had he claimed Minnesota residency and filed a state income-tax return, he would have had to pay $15,036 in state income taxes.

Using Enyeart's flight schedules, bank records, Federal Aviation Administration records, and court documents, the state calculated the number of days Enyeart was present in Minnesota during the last three months of 1997 and the calendar years 1998, 1999, and 2000. The state attributed a day to Minnesota residency only if there was evidence that Enyeart was beginning or ending a flight in Minnesota or that he was conducting business in the state (closing a loan or attending a doctor's appointment, for example). The state did not count days in which Enyeart flew into or out of Minnesota in transit to another state or days in which Enyeart conducted business in another state. The state documented that in 1998 Enyeart spent 194 days in Minnesota and only twelve full days in Alaska. In 1999, Enyeart was in Minnesota 144 days and in Alaska two full days. In 2000, Enyeart was in Minnesota 186 days and in Alaska two partial days.

Enyeart's bank records indicate that between January 1998 and December 2000, Enyeart made 240 ATM transactions in Minnesota. During the same period, he made only three transactions in Alaska. Enyeart's bank records were mailed to his Minnetonka address until he moved in April 1999. His bank records for the remainder of 1999 and 2000 were mailed to his Shorewood address. Enyeart's cell phone records also show that the vast majority of calls were made to locations within Minnesota.

The Minnesota Department of Revenue (DOR) began investigating Enyeart after receiving a tip from Enyeart's brother in August 1999, indicating that Enyeart was evading state income taxes. Investigators discovered that Enyeart was listed in metro-area phonebooks at either his Minnetonka or his Shorewood address from 1997 until 2000.

In March 2001, Enyeart attempted to have the relative homestead status on the Shorewood residence removed for the tax year 2000 because his brother had moved out. Enyeart backdated the letter requesting the removal to January 1999. The relative homestead status was removed in 2001 and a penalty was assessed. On the day he requested the removal of the relative homestead status, Enyeart also contacted his insurance company to change his mailing address from Minnesota to Alaska.

In June 2001, Enyeart gave DOR agents a handwritten letter from his father and a typewritten letter from fellow NWA pilot Tim Branaman, indicating that Enyeart lived in Alaska. He also gave the DOR a photocopy of a lease agreement he signed with a storage facility in Minnesota. The photocopy, dated September 1999, showed an address and telephone number in Anchorage. The original, however, which DOR agents later obtained, listed Enyeart's Shorewood address and Minnesota telephone numbers.

During a search of Enyeart's Shorewood residence in September 2001, DOR agents did not find any financial records for the years 1997 to 2001. Agents discovered that Enyeart's computer hard drive contained a letter identical to the letter, purportedly from his father, that Enyeart had submitted to the DOR, and a proposed letter directed to the DOR, purportedly from Branaman. In his testimony Brana-

man admitted that Enyeart essentially wrote the letter that actually went to the DOR. The first page of the letter on Enyeart's hard drive outlines the history of their friendship and Branaman's gratitude to Enyeart for providing him a place to stay in Minneapolis in the early years of their employment. At the bottom of the first page, the letter states "we have had the opportunity to experience the following in Alaska together." At the top of the second page Enyeart wrote: "(use your imagination here)" and left ten blank lines.

A search of the Anchorage condominium revealed that Enyeart had no personal belongings there. The maintenance man for the condominium complex testified that although Enyeart received mail at the condo, he had seen Enyeart only one time before September 2001.

In March 2002, the state charged Enyeart with one count of filing a fraudulent tax return for the 1998 tax year in violation of Minn.Stat. § 289A.63, subd. 2(a) (2002); two counts of tax evasion for the 1999 and 2000 tax years in violation of Minn.Stat. § 289A.63, subd. 1(a) (2002); and two counts of failure to pay motor-vehicle taxes in violation of Minn.Stat. § 297B.10(a) (2002). The court denied Enyeart's motion to dismiss the charges on grounds of vagueness, reasoning that the statutes under which Enyeart was charged were not unconstitutionally vague. A jury subsequently found Enyeart guilty as charged. This appeal followed the judgment of conviction and sentence.

## ISSUES

I. Is Minnesota's domicile rule unconstitutionally vague?

II. Did the district court commit prejudicial error by refusing to instruct the jury that they had to agree on which theory of residency the state had proved?

III. In cases involving the non-domiciliary status of an air-carrier employee, does federal law preempt the state's method for counting days spent in Minnesota for income-tax purposes?

IV. Did the district court impermissibly shift the burden of proof to Enyeart by admitting into evidence a copy of the rule that requires taxpayers claiming to be nonresidents to have available for examination adequate records to substantiate that they spent more than one-half of the tax year outside Minnesota?

## ANALYSIS

### I

Enyeart first argues that the rule governing whether a person is domiciled in the state for income-tax purposes is "too ill-defined to form the basis for a criminal prosecution." Specifically, Enyeart argues that the rule is unconstitutionally vague on its face and as applied because it does not specify what factors a taxpayer must satisfy to establish domicile in a particular state and invites arbitrary and discriminatory enforcement. We disagree.

Laws are presumed to be constitutionally valid. Minn.Stat. § 645.17(3) (2002); *Associated Builders & Contractors v. Ventura,* 610 N.W.2d 293, 298 (Minn. 2000). The presumption of constitutional validity governs the adjudication of constitutional challenges until disproved beyond a reasonable doubt. *Hickman v. Group Health Plan, Inc.,* 396 N.W.2d 10, 13 (Minn.1986). Courts have a duty to uphold legislative enactments as reasonably certain when possible, and should "resort to all acceptable rules of ˙construction to discover a competent and efficient expres-

sion of the legislative will." *State v. Suess,* 236 Minn. 174, 180, 52 N.W.2d 409, 414 (1952). The courts' power to declare a statute unconstitutional should be exercised "with extreme caution and only when absolutely necessary." *State v. Fingal,* 666 N.W.2d 420, 423 (Minn.App.2003), *review denied* (Minn. Oct. 21, 2003).

█ The void-for-vagueness doctrine requires that statutes define an offense (1) with sufficient definiteness and certainty that persons of ordinary intelligence can understand what conduct is prohibited or mandated, and (2) in a manner that does not encourage arbitrary and discriminatory enforcement. *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983); *State v. Newstrom,* 371 N.W.2d 525, 528 (Minn.1985). The doctrine is based on fairness and is not designed to "convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited." *Colten v. Kentucky,* 407 U.S. 104, 110, 92 S.Ct. 1953, 1957, 32 L.Ed.2d 584 (1972), *quoted in State v. Willenbring,* 454 N.W.2d 268, 270–71 (Minn.App.1990), *review denied* (Minn. May 30, 1990). The vagueness doctrine does not preclude the use of broad, flexible standards that require persons subject to a statute to exercise judgment. *State v. Kuluvar,* 266 Minn. 408, 417, 123 N.W.2d 699, 706 (1963). Instead, uncertainty invalidates a statute only when those subject to it cannot determine with reasonable certainty whether a particular act is forbidden or permitted. *Id.*

██ A person is a resident for purposes of taxation if the person is either (1) domiciled in Minnesota, or (2) domiciled outside Minnesota but maintains a place of abode in the state and spends in the aggregate more than one-half of the tax year in Minnesota. Minn.Stat. § 290.01, subd. 7 (2002). The term "domicile" means

the bodily presence of an individual person in a place coupled with an intent to make such a place one's home. The domicile of any person shall be that place in which that person's habitation is fixed, without any present intentions of removal therefrom, and to which, whenever absent, that person intends to return.

Minn. R. 8001.0300, subp. 2 (2001). The most significant factor in determining domicile is the person's intent to remain in a fixed place. *Manthey v. Comm'r of Revenue,* 468 N.W.2d 548, 550 (Minn.1991).

Rule 8001.0300 lists twenty-six items courts must consider in determining whether a person intended to make a particular state his or her home:

A. location of domicile for prior years; B. where the person votes or is registered to vote, but casting an illegal vote does not establish domicile for income tax purposes; C. status as a student; D. classification of employment as temporary or permanent; E. location of employment; F. location of newly acquired living quarters whether owned or rented; G. present status of the former living quarters, i.e., whether it was sold, offered for sale, rented, or available for rent to another; H. whether homestead status has been requested and/or obtained for property tax purposes on newly purchased living quarters and whether the homestead status of the former living quarters has not been renewed; I. ownership of other real property; J. jurisdiction in which a valid driver's license was issued; K. jurisdiction from which any professional licenses were issued; L. location of the person's union membership; M. jurisdiction from which any motor vehicle license

was issued and the actual physical location of the vehicles; N. whether resident or nonresident fishing or hunting licenses purchased; O. whether an income tax return has been filed as a resident or nonresident; P. whether the person has fulfilled the tax obligations required of a resident; Q. location of any bank accounts, especially the location of the most active checking account; R. location of other transactions with financial institutions; S. location of the place of worship at which the person is a member; T. location of business relationships and the place where business is transacted; U. location of social, fraternal, or athletic organizations or clubs or in a lodge or country club, in which the person is a member; V. address where mail is received; W. percentage of time (not counting hours of employment) that the person is physically present in Minnesota and the percentage of time (not counting hours of employment) that the person is physically present in each jurisdiction other than Minnesota; X. location of jurisdiction from which unemployment compensation benefits are received; Y. location of schools at which the person or the person's spouse or children attend, and whether resident or nonresident tuition was charged; and Z. statements made to an insurance company, concerning the person's residence, and on which insurance is based.

Minn. R. 8001.0300, subp. 3 (2001).

Rule 8001.0300 does not specify the amount of evidence necessary to prove an intention to change one's domicile. On the contrary, the rule provides that "[n]o positive rule can be adopted with respect to the evidence necessary to prove an intention to change a domicile." Minn. R. 8001.0300, subp. 2; *see also Manthey*, 468 N.W.2d at 550 (stating that "[n]o magic formula exists for determining a change in

one's domicile"). Instead, a person's intention to change domiciles is proved by acts and declarations, and of the two forms of evidence, acts shall be given more weight than declarations. Minn. R. 8001.0300, subp. 2.

In addition to the twenty-six factors the rule lists, several presumptions are relevant to a determination of domicile. First, the place where a person's family is domiciled is presumed to be that person's domicile, and the domicile of a parent who has legal custody of a child is presumed to be the child's domicile. Minn. R. 8001.0300, subp. 2. Additionally, one's domicile is presumed to be the place where one lives. *Id.* And once domicile is established, it is presumed to continue until the contrary is shown. *Id.; see Comm'r of Revenue v. Stamp*, 296 N.W.2d 867, 870 (Minn.1980). The absence of an intention to abandon an existing domicile is equivalent to an intention to retain it. Minn. R. 8001.0300, subp. 2.

█ To succeed in a facial challenge to vagueness outside the context of the First Amendment, a complainant must demonstrate that the law is impermissibly vague in *all* its applications. *Vill. of Hoffman Estates v. Flipside*, 455 U.S. 489, 495–96, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982). Enyeart argues that the domicile rule is facially vague because it does not indicate how many of the twenty-six factors it lists are necessary to establish domicile. Enyeart specifically argues that because expert testimony from a DOR agent failed to show a regulatory scheme with a fixed method for weighing the factors, a taxpayer could not exercise the required criminal intent to violate the requirements. We disagree.

The DOR agent testified that the rule does not provide a fixed method for weighing the domicile factors, but it nonetheless

provides guidance. As an example, he noted that subpart 2 of the rule informs taxpayers that their actions will be given more weight than their declarations. The agent pointed out that the rule is not "extremely difficult," and that the rule's application is governed by "common sense."

 The fact that taxpayers must rely on common sense and intelligence to determine whether their conduct complies with the law does not render the law unconstitutionally vague on its face. *See Kuluvar*, 266 Minn. at 417, 123 N.W.2d at 706 (providing that use of broad, flexible standards requiring exercise of judgment is not constitutionally precluded). A law that is flexible and reasonably broad is nonetheless constitutional if it is clear what the law as a whole proscribes. *Grayned v. City of Rockford*, 408 U.S. 104, 110, 92 S.Ct. 2294, 2300, 33 L.Ed.2d 222 (1972). A criminal statute need not be drafted with absolute certainty or mathematical precision. *See, e.g., Suess*, 236 Minn. at 180, 52 N.W.2d at 414. Instead, to comply with due process, criminal statutes drafted in general and flexible terms must furnish only a test based on criteria that "[persons] of common intelligence who come in contact with the statute may use with reasonable safety in determining its command." *Id.* Specificity will always be limited by the necessity to draft statutes that are general enough to address the diversity of human conduct and specific enough to provide adequate notice. *See Colten*, 407 U.S. at 110, 92 S.Ct. at 1957. A statute that is flexible and reasonably broad will thus be upheld if people of common intelligence do not have to guess at what the statute means or differ as to its application. *Suess*, 236 Minn. at 180, 52 N.W.2d at 413–14. All that is required is reasonable certainty. *Id.*

Although the domicile rule does not provide a magic formula for determining when a taxpayer has established an intention to change domiciles—relying instead on an exhaustive list of determinative factors—it specifies a standard of conduct that ordinary people of reasonable intelligence can understand. Contrary to Enyeart's claim, the statute does not defy common understanding but *relies* on it, and few people—if any—could misapprehend what they need to do to establish an intention to change domiciles. The theoretical possibility of an erroneous classification of a taxpayer as a domiciliary resident is insufficient to establish that the statute provides no comprehensible standard of conduct at all. The rule is thus not unconstitutionally vague on its face.

 Enyeart next argues that the rule is vague as applied to him, because some of the regulatory factors support a finding that he was an Alaska resident while others favor a finding that he was a Minnesota resident. Contrary to Enyeart's argument, however, this case is a paradigm of domiciliary residence.

After declaring a change of domicile in 1997, Enyeart continued to live in his Minnetonka house until 1999, and he insured and homesteaded the house. He subsequently bought the Shorewood townhouse and signed a statement of occupancy and a residential-loan application in which he indicated that he planned the townhouse to be his principal residence. Enyeart bought homeowner's insurance and filed a homestead application for the townhouse in 1999.

Although his flight base moved from Minneapolis to Detroit in 1999, Enyeart continued to have his bank records and his NWA pay stubs and withholding information sent to the Minneapolis/St. Paul base. And he continued to list his Minnetonka or Shorewood address as his current

address on his checks, in his dissolution petition, on loan applications, on applications for homestead status and medical certificates of fitness, and on school-emergency-notification cards for his sons. Enyeart also retained his Minnesota driver's license and used it routinely for identification purposes. Not surprisingly, in January 2000, Enyeart told Hennepin County officials that he had been a Minnesota resident for the past ten years. These facts clearly reflect Enyeart's intention to remain in Minnesota.

The number of days Enyeart spent in Minnesota and Alaska confirm Enyeart's intention to make Minnesota his home. Records show that in 1998, Enyeart spent 194 days in Minnesota and twelve days in Alaska. In 1999, he spent 144 days in Minnesota and two days in Alaska. And in 2000, he spent 186 days in Minnesota and two partial days in Alaska. Enyeart kept no personal belongings in his Alaska condominium, and he made only three ATM transactions in Alaska between January 1998 and December 2000. By contrast, during the same period, he made 240 ATM transactions in Minnesota.

Finally, Enyeart's fraudulent attempts to create the appearance that he was an Alaska resident leave no doubt as to his intent to remain in Minnesota while obtaining the tax benefits of claiming to be an Alaska resident. Enyeart backdated changes he made in NWA's computerized employee database that identified his residence. He also backdated a letter he wrote in March 2001 to remove the relative homestead status on the Shorewood townhouse for the tax year 2000. In addition, Enyeart drafted a letter for his father to send to the DOR, indicating that Enyeart was a resident of Alaska. And he drafted a letter for fellow pilot Tim Branaman to send the DOR, in which he urged him to "[u]se [his] imagination" to write

about experiences they had in Alaska. Finally, Enyeart submitted to the DOR a photocopy of a mini-storage receipt that had been altered to reflect his Anchorage address and phone number. Enyeart's claim that the regulatory scheme is vague as applied to him lacks merit.

## II

■ Enyeart also argues that the district court committed prejudicial error by refusing to instruct the jury that they had to agree unanimously on which theory of residency the state had proved. Specifically, Enyeart argues that the district court should not have permitted the state to proceed on the theory that he was a domiciliary resident, and that because the court failed to give his requested instruction on unanimity, it is impossible for a reviewing court to determine whether the jury found him guilty on the theory that he was a domiciliary resident or a nondomiciliary resident. We do not agree.

■ First, as we have just concluded, the revenue department rule is not unconstitutionally vague. The state, therefore, properly prosecuted Enyeart on both residency theories. Second, the jury's finding of guilt on the charges based on his 1997 and 1999 conduct, which were premised on a domiciliary-resident theory, clearly establishes that the jury believed Enyeart was a domiciliary resident. Finally, "unanimity is not required with respect to the alternative means or ways in which the crime can be committed." *State v. Begbie,* 415 N.W.2d 103, 106 (Minn.App.1987) (quotation omitted); *review denied* (Minn. Jan. 20, 1988); *see also Schad v. Arizona,* 501 U.S. 624, 633, 111 S.Ct. 2491, 2497, 115 L.Ed.2d 555 (1991) (holding that submission to jury of alternative theories of criminal charge, without requiring jury's agreement on a theory, was not unconstitutional); *State v. Day,* 501 N.W.2d 649,

653 (Minn.App.1993) (holding that appellant's right to unanimous verdict not violated when instruction allowed jury to convict without specifying which alternative theory of guilt applied). Instead, "[u]nanimity is required only with respect to the ultimate issue of the defendant's guilt or innocence of the crime charged." *Begbie*, 415 N.W.2d at 106 (quotation omitted).

## III

Enyeart brought a pretrial motion to dismiss charges premised on the theory that he was a nondomiciliary resident, claiming that 49 U.S.C. § 40116 (2000) preempts the state's method of calculating days spent in Minnesota in cases involving the nondomiciliary status of air-carrier employees. The district court denied the motion. Enyeart subsequently moved for a jury instruction requiring the jury not to count days he flew in, out of, or over the state in determining residency. The court denied the motion, and instead instructed the jury that

> a person shall be treated as present in Minnesota on any day if the person is physically present in the State of Minnesota at any time during the day. However, a person in transit between two points outside of Minnesota who is physically present in Minnesota less than 24 hours will not be treated as present in Minnesota.

Enyeart now argues that because federal law preempts the domicile rule's method for counting days spent in Minnesota, the district court abused its discretion by denying his requested instruction.

■■■ District courts have considerable latitude in selecting the language of jury instructions. *State v. Gray*, 456 N.W.2d 251, 258 (Minn.1990). But jury instructions may not materially misstate the law. *State v. Pendleton*, 567 N.W.2d 265, 269 (Minn.1997). We review jury instructions to determine whether, taken as a whole, they fairly and accurately state the law. *Gray*, 456 N.W.2d at 258.

■■■ In determining whether state law is preempted by federal law, a reviewing court's sole task is to ascertain Congress's intent. *See Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987). When Congress legislates in a field traditionally occupied by the states, this court must start with the presumption that the states' historic police powers were not to be superseded by the federal law unless that was the clear and manifest purpose of Congress. *Dahl v. Charles Schwab Co.*, 545 N.W.2d 918, 922 (Minn.1996).

■■■ Federal law preempts state law when Congress expressly states that state law is preempted. *Cal. v. ARC Am. Corp.*, 490 U.S. 93, 100, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86 (1989). Absent an express statement by Congress, congressional intent to preempt state law in a particular area may be inferred when the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary state regulation. *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 31, 116 S.Ct. 1103, 1108, 134 L.Ed.2d 237 (1996). When Congress has not occupied the field, state law may nevertheless be preempted when compliance with both state and federal law is impossible, *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), or when state law is in "irreconcilable conflict" with federal law, *Rice v. Norman Williams Co.*, 458 U.S. 654, 659, 102 S.Ct. 3294, 3299, 73 L.Ed.2d 1042 (1982). An irreconcilable conflict exists when a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives

of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

Preemption, however, should not be "lightly presumed." *Guerra*, 479 U.S. at 281, 107 S.Ct. at 689. To avoid a finding of preemption, a federal law and a state system of regulation should be read in tandem, particularly in cases where the state law or regulation at issue touches on traditional areas of state sovereignty, such as taxation. *See ARC Am. Corp.*, 490 U.S. at 101, 109 S.Ct. at 1665; *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S. 117, 127, 94 S.Ct. 383, 389, 38 L.Ed.2d 348 (1973).

In relevant part, 49 U.S.C. § 40116 provides that the pay of air-carrier employees is subject to taxation by only two states: the state where the employee resides and the state where the employee earns more than fifty percent of his or her pay from the carrier. *Id.*, (f)(3)(A), (B). The bill "reserves to the individual states the present practice of taxing substantial compensation which is earned by a non-resident," but it "limit[s] that practice ... to states wherein more than 50 per centum of the non-resident interstate carrier employee's compensation is earned." S.Rep. No. 91–1261, at 5 (1970), *reprinted in* 1970 U.S.C.C.A.N. 5039, 5043.

Minn.Stat. § 290.01, subd. 7 (2002) defines "resident" as "any individual domiciled outside the state who maintains a place of abode in the state and spends in the aggregate more than one-half of the tax year in Minnesota." For tax purposes, presence within the state for any part of a calendar day constitutes a day spent in the state. *Id.* But "a person in transit between two points outside Minnesota who is physically present in Minnesota less than 24 hours, will not be treated as present in Minnesota on any day during transit." Minn. R. 8001.0300, subp. 4 (2001). Eny-

eart's argument that the federal statute preempts the state's method for calculating the number of days a taxpayer spends within and without Minnesota ignores the rule.

Enyeart argues that state law conflicts with the federal statute by equating residency with physical presence in the state and thereby allowing taxation by more than the state of residency or the state where the employee earns more than fifty percent of his or her pay from the airline. But state law does not equate residency with mere physical presence. On the contrary, it *precludes* such an equation by requiring that in determining the number of days spent in the state, time spent by a taxpayer in transit *not* be counted as time spent in Minnesota. Contrary to Enyeart's argument, a person's mere presence in the state does not render him or her liable to state taxation. Instead, presence in the state counts only if the person subject to taxation remains in the state for more than twenty-four hours. *See* Minn. Stat. § 290.01, subd. 7; Minn. R. 8001.0300, subp. 4.

Enyeart also argues that state law thwarts or stands as an obstacle to the federal statute's objective of limiting multistate taxation. But by providing that a person in transit between two points outside Minnesota who spends less than twenty-four hours in the state will *not* be treated as present within the state, the rule avoids taxing air-carrier employees with minimal or transitory contacts with the state and thereby furthers the federal goal of avoiding multistate taxation.

Enyeart urges this court to read the federal statute to preclude a state from considering any part of a day in which an air-carrier employee works in Minnesota as a day spent in the state, claiming that a different reading would allow the state to

tax income generated from less than fifty percent of scheduled flight time. But the state's residency requirements are not based on a pilot's scheduled flight time within the state but on the pilot's physical presence in the state for at least twenty-four hours, enjoying the services and protections the state affords. A rule that would make residence contingent on flight time would unduly limit the state's legitimate interest in taxing state residents, an interest the federal statute expressly recognizes by permitting states to tax pilots who are residents.

Because Minn.Stat. § 290.01, subd. 7 is not in "irreconcilable conflict" with 49 U.S.C. § 40116, it is not preempted. The district court's instruction accurately stated the law and does not, therefore, constitute an abuse of discretion.

## VI

■ Enyeart last argues that the district court committed prejudicial error by admitting Minn. R. 8001.0300 (2001) into evidence without redacting the portion of the rule that requires any person claiming to be a nonresident of the state to "have available for examination adequate records to substantiate that more than one-half of the tax year was spent outside Minnesota." *Id.*, subp. 5. Enyeart claims that the rule impermissibly shifted to him the burden of proving his innocence.

■ Evidentiary rulings rest within the district court's broad discretion and will not be reversed absent an abuse of that discretion. *State v. Lee,* 645 N.W.2d 459, 465 (Minn.2002). A defendant claiming that the district court abused its discretion in admitting evidence bears the burden of proving both error and prejudice. *Id.* An error is prejudicial only if it "substantially influence[s] the jury to convict." *Id.*

■ In every criminal prosecution, the state has the burden of proving the charged crime beyond a reasonable doubt. *State v. Robinson,* 604 N.W.2d 355, 362 (Minn.2000). The tax-evasion charges in this case required the state to prove beyond a reasonable doubt that Enyeart was either a domiciliary or a nondomiciliary resident of Minnesota. The court so instructed the jury.

Minn. R. 8001.0300, subp. 5, requires taxpayers claiming to be nonresidents of Minnesota to maintain adequate records to substantiate their claim that they spent more than one-half of the tax year outside Minnesota. Admittedly, the rule places an administrative burden on taxpayers to maintain tax records and permits an inference that taxpayers who do not maintain such records might have been lying about their nonresident status. But the rule does not release the state of its obligation of proving beyond a reasonable doubt, with or without the taxpayer's records, that the taxpayer spent more than one-half the tax year in the state. And a conviction could not be based merely on evidence that the taxpayer failed to maintain adequate records.

■ The admission of the rule clearly did not help Enyeart; but it did not shift the burden of proof to him. The fact that the jury was able to draw negative inferences from Enyeart's failure to maintain records, does not render the rule inadmissible. Inferences are permitted when they have a "reasonable relation to the circumstances of life as we know them," and the facts "are likely to be much more easily provable by the defendant than by the state, and the nature of the charge ... make[s] it fair to call on the defendant to produce evidence." *State v. Reps,* 302 Minn. 38, 51, 223 N.W.2d 780, 788–89 (1974) (quotation omitted).

Even if we were persuaded that the rule was improperly admitted, the error would be harmless because the jury was properly instructed that the state had the burden of proof and Enyeart's counsel stated in closing argument that the jury instructions controlled. Counsel specifically told the jury that Enyeart was not required to prove the number of days he spent outside the state and drew a distinction between civil cases, where the taxpayer has the burden of proof, and criminal cases, where the state is required to prove the number of days a taxpayer spends in the state. Most important, the evidence overwhelmingly establishes that Enyeart spent more than 183 days in the state during 1998 and 2000 and was thus a domiciliary resident of Minnesota. Any error in admitting subpart 5 of the rule is thus harmless.

## DECISION

The district court correctly concluded that the domicile rule is neither unconstitutionally vague nor preempted by federal law. And the district court neither abused its discretion by refusing to instruct the jury that they had to agree on which theory of residency the state had proved nor shifted the burden of proof by admitting rule 8001.0300 into evidence without redacting subpart 5.

**Affirmed.**