Kenneth B. MAUER Relator,

v.

COMMISSIONER OF REVENUE, Respondent.

No. A12–0499.

Supreme Court of Minnesota.

April 17, 2013.

---

Bradford S. Delapena, Saint Paul, MN, Constance Jean Paiement, Paiement Law Office, Stillwater, MN, for relator.

Lori Swanson, Attorney General, Mark B. Levinger, Tamar N. Gronvall, Assistant Attorneys General, Saint Paul, MN, for respondent.

## OPINION

ANDERSON, PAUL H., Justice.

Kenneth B. Mauer, a Saint Paul, Minnesota native who at all times relevant to this case was employed by the National Basketball Association as a referee, did not file Minnesota income tax returns for the 2003 and 2004 tax years. Following an inquiry by the Minnesota Department of Revenue, Mauer filed a 2003 state tax return as a part-year Minnesota resident. The Department subsequently conducted a tax audit of Mauer, after which the Commissioner of Revenue determined that Mauer was a full-time, legal resident of Minnesota during the 2003 and 2004 tax years. Mauer filed an administrative appeal in which he asserted that, in July 2003, he established his domicile in Fort Myers, Florida, and therefore he was not required to file a Minnesota tax return as a full-time resident for either the 2003 or the 2004 tax year. After considering Mauer's administrative appeal, the Commissioner again determined that Mauer was a full-time Minnesota resident during the 2003 and 2004 tax years. Mauer ap-pealed the Commissioner's determination to the Minnesota Tax Court, which affirmed the Commissioner. Mauer then filed a petition for certiorari with our court challenging the decision of the tax court.

■ Whether a taxpayer has changed domicile is ordinarily a question of fact, which means we review the court's decision to determine if there is sufficient evidence in the record to support the decision. Our review of the court's fact-specific analysis of the factors weighing for and against Mauer's continuing domicile in Minnesota shows that, when all the relevant factors are weighed and considered, including Mauer's acts and statements, there is more than sufficient evidence to support the tax court's decision. More specifically, the court correctly concluded that Mauer failed to carry his burden of overcoming the legal presumption that he remained domiciled in Minnesota during the 2003 and 2004 tax years. We affirm.

Relator Kenneth B. Mauer was born in 1955 in Saint Paul, Minnesota. After high school, Mauer attended Anoka–Ramsey Junior College, where he played baseball, basketball, and football competitively. During Mauer's freshman year at Anoka–Ramsey, he took a course in refereeing and thereafter he began to officiate football, baseball, and basketball games. As a result of this experience, Mauer realized that he "loved" refereeing athletic games and decided to pursue a career as a professional referee. After one year at Anoka–Ramsey, Mauer earned a baseball scholarship to the University of Minnesota, graduating in 1977.

By the time Mauer was 24, he had begun attending National Basketball Association (NBA) summer camps so that he could advance his career as a professional basketball referee. Mauer began his pro-

fessional career by refereeing NBA summer training games in Milwaukee, Detroit, and Chicago. In the winter, Mauer would return to Minnesota as well as referee high school and college football, basketball, and baseball games. In 1986, Mauer's work at the NBA summer camps paid off when the NBA hired him as a full-time referee. Employment as a referee with the NBA requires extensive travel nationwide between late September and early June. During the NBA season, Mauer spends as many as 27 days per month on the road. During the summer months, Mauer frequently travels abroad. Throughout his NBA career, and at least up through the disputed 2003–04 time frame in this case, Mauer continued to referee high school football games in Minnesota each fall.

In 1987, Mauer purchased six acres of land in Afton, Minnesota and retained an architect to design a large, year-round home for the property. Mauer began construction of the home in May 1990, and moved into the partially completed home in September 1991. Mauer completed and furnished the home as funds became available, and he completed the entire 10,600–square–foot home by 2002. During the time frame relevant to this case, Mauer carried insurance coverage for the Afton home in the amount of approximately $2,194,900. The Afton home was Mauer's sole residence until July 2003.

On September 12, 1994, the Internal Revenue Service initiated "Operation Slam Dunk," an investigation into whether NBA referees were evading federal income taxes through the use of airline ticket-refund policies. As a result of this IRS investigation, the United States Department of Justice indicted 22 NBA referees, including Mauer, for violation of federal tax laws. On July 11, 2000, Mauer was indicted on one count of endeavoring to obstruct and

impede due administration of tax laws and four counts of tax evasion. A federal petit jury sitting in Minnesota found Mauer guilty on four out of the five counts, and on April 24, 2001, the United States District Court for the District of Minnesota sentenced Mauer to five months in prison, 800 hours of community service, and three years of supervised release, including five months of home confinement. The home-confinement part of Mauer's sentence was served in Minnesota. The last day of Mauer's home confinement under his federal sentence was June 30, 2003.

The next day, July 1, 2003, Mauer flew from Minnesota to Fort Myers, Florida. Two days later, Mauer signed a purchase agreement for a townhome in Fort Myers for a total purchase price of $235,038.51. That same day, Mauer obtained a Florida driver's license, surrendered his Minnesota driver's license, and registered to vote in Florida. On July 4, Mauer flew from Florida to Kentucky to visit family members, and then returned to Minnesota on July 7. On the same day he returned to Minnesota, Mauer's accountant sent him a letter with advice on how to establish Mauer's domicile in Florida. The accountant also advised Mauer to keep a detailed log of where he spent his time so that he could prove that he was in Minnesota for less than one-half of each year. On July 9, Mauer signed a Florida declaration of domicile before a Minnesota notary public. The closing on Mauer's Fort Myers townhome was on July 9, but Mauer did not attend the closing in person because he remained in Minnesota.

Over the next several months, Mauer traveled extensively between Minnesota, Florida, and other locations. On July 11, 2003, Mauer left Minnesota for a personal vacation to Europe, returning to Minnesota on July 27. He remained in Minnesota until August 8, when he left for a personal

vacation to Saint Kitts. Mauer returned to Minnesota on August 17 and wrote in his travel log for that day that he had "returned home"—meaning Minnesota. On August 27, Mauer moved some of his household furniture and personal belongings from his Afton home to his Fort Myers townhome. Mauer returned to Minnesota one day later. In August and September 2003, Mauer left from and returned to Minnesota for several trips, including to Fort Myers and a vacation in Las Cruces, New Mexico. Mauer acknowledged that he remained in Minnesota during a significant portion of that fall so he could referee high school football games.

On August 27, 2003, Mauer filed an application seeking a homestead exemption for his Fort Myers townhome. Mauer purchased insurance for the Fort Myers townhome through a Florida insurance agent and engaged a Florida tax consultant to assist him with Florida tax issues. Later in the fall of 2003, Mauer contacted officials in Washington County, Minnesota, to request that they remove the homestead status from his Afton home.

After purchasing the Fort Myers townhome, Mauer provided the townhome's address to the NBA as his main residence. The official NBA referee list made available for the NBA's 2003 training camp included both Mauer's Afton and Fort Myers addresses. The NBA used Mauer's Afton address through the 2003–04 NBA season for tax purposes. Mauer made his own travel arrangements for getting to and from NBA games during the 2003–04 season, and he primarily traveled in and out of Minnesota.

Mauer's NBA pay was deposited into a Minnesota bank account through November 2003. In December 2003, Mauer opened a bank account in Fort Myers. From that point through the end of 2004, he had one-half of his pay deposited into his Florida account and one-half into his Minnesota account. The record contains 18 months of records for Mauer's Minnesota bank account, covering the last one-half of 2003 and all of 2004. During that time, Mauer wrote approximately 470 checks on the Minnesota account, or an average of 26 checks per month. The record contains only two months of records from the Florida bank account, during which time Mauer wrote 7 checks, or an average of 3.5 checks per month from the Florida account during the period in the record.

Between the start of the NBA regular season in October 2003 and the end of December 2003, Mauer was physically present in Minnesota on 36 days, including one game-day assignment. During that same period, Mauer was physically present in Florida for 15 days, two of which were game-day assignments. During the fall and winter months in late 2003, Mauer would often stay in Minnesota for four or five nights at a time. Mauer's longest stay in Fort Myers during that period was three nights. On December 28, 2003, Mauer flew to Fort Myers for a longer trip, a stay that he described in his travel log as a "vacation."

During the 2003–04 NBA season, the NBA expressed concern about Mauer's travel arrangements. The NBA gave Mauer a block travel stipend to cover his travel expenses and calculated that stipend based on Mauer having designated Fort Myers as his home airport. But the NBA learned that Mauer was, in fact, traveling in and out of Minneapolis–Saint Paul rather than Fort Myers, and believed that Mauer was being over-reimbursed for his travel. In January 2004, the NBA notified Mauer that it would not pay Mauer's requested January 11, 2004 travel stipend because Mauer was staying in Minnesota and was not actually traveling

in and out of Fort Myers. The NBA and Mauer exchanged a series of contentious letters on the issue of whether Mauer was accurately reporting his travel locations, including a letter in which the NBA threatened Mauer with sanctions, up to and including termination of his employment as an NBA referee. Eventually, Mauer hired a travel agent who prepared a one-page handwritten travel cost summary showing that Mauer's designation of Fort Myers as his home airport cost the NBA $65,193.54, whereas a designation of Minnesota would have cost the NBA $66,806.49—an alleged savings to the NBA of $1,612.95. Following the receipt of this summary, the NBA relented on its internal inquiry into Mauer's travel expenses.

During the tax years at issue, Mauer owned and maintained four motor vehicles: (1) a 2004 Lexus GX–470, which Mauer acquired in late 2003, and which was registered and garaged in Minnesota during the 2003 and 2004 tax years; (2) a 1993 Lexus LS–400, which was registered and garaged in Minnesota at least until late 2003; (3) a 1989 Rolls Royce Corniche, which was registered and garaged in Minnesota during the 2003 and 2004 tax years; and (4) a 1988 Honda Accord, which was registered and garaged in Florida starting in August 2003 through the end of 2004, and which was insured through a Florida insurance agent. There is some dispute over the location of the 1993 Lexus after late 2003. Mauer claims the tax court's finding that the 1993 Lexus was in Minnesota until late 2003 means that it was moved to Florida after that time; but there is no support for that claim in the record. In fact, as the Commissioner notes, one of the parties' joint exhibits shows that, at least through the end of 2004, Mauer insured the 1993 Lexus on the same Minnesota policy with his Afton home and other Minnesota property.

After purchasing the Fort Myers townhome, Mauer purportedly made efforts to sell his Afton home. In July 2003, Mauer contacted a friend, who was a licensed realtor, about selling the Afton home. The realtor was associated with a real estate brokerage firm with offices in Saint Paul, but was not himself a licensed broker. On July 15, Mauer and the realtor entered into a listing agreement for the sale of the Afton home. The only evidence in the record indicating that the Afton home was actually placed on the market is this listing agreement. The listing agreement did not mention the realtor's brokerage firm and did not include any other broker or firm to help list the Afton home for sale. In Minnesota, a broker is typically involved in the sale of real estate. *See* Minn.Stat. § 82.55, subd. 19 (2012). Mauer set the sale price for the home at $3.1 million. The realtor stated that he thought the suggested price was too high, but Mauer told the realtor that he "did not want to hear" what price the home should be listed for. Mauer asserts that he based the sale price upon an appraisal that a real estate professional prepared, but a copy of that appraisal was never produced for the record.

The Afton home was not listed with the Multiple Listing Service nor in any magazines, including a luxury homes magazine produced by the realtor's brokerage firm. Neither Mauer nor his realtor placed a "for sale" sign on the property, held any open houses, or showed the home to a potential buyer. The realtor testified that he produced flyers about the Afton home, but the only location where the realtor could recall placing the flyers was at the 3M offices. There is no record of the flyers or of any potential buyers or interested parties. The Afton home was never sold and Mauer and his realtor did not renew their listing agreement when it expired on July 15, 2004. During 2003 and

2004, Mauer maintained insurance on the Afton home, including coverage for $1.6 million worth of personal property.

In 2004, Mauer continued a travel schedule similar to his 2003 schedule, including extensive travel for both work and pleasure. On January 2, 2004, Mauer returned to Minnesota from what he described in his travel log as a "vacation" to Fort Myers. He stayed in Minnesota for four nights before traveling to Dallas, Texas, and Denver, Colorado. From Denver, Mauer again returned to Minnesota for three nights. Mauer then traveled to Chicago, Illinois, and Indianapolis, Indiana, before spending one day in Fort Myers. Mauer finished January with more extensive work travel, punctuated by a three-day stay in Minnesota and a two-day stay in Fort Myers. In February 2004, Mauer had a similar travel pattern: extensive work travel punctuated by extended stays in Minnesota of three, five, or six days, and shorter stays in Fort Myers. After Mauer's January 2, 2004 return from Fort Myers to Minnesota, Mauer did not spend his next full day in Fort Myers until at least January 30.[1] In March, Mauer traveled extensively and did not return to Minnesota. He stayed in Fort Myers for six nights at the beginning of the month. But this March stay in Fort Myers is not only overshadowed by the time spent in Minnesota in January and February, but also by the fact that Mauer did not return to Fort Myers between March 30 and April 28, during which time he had a six-night stay in Minnesota.

In all of 2004, Mauer spent 181 days in Minnesota, 64 days in Florida, and 121 days in other locations. During the off-season between the end of the 2003–04 NBA season and the start of the 2004–05 NBA season, Mauer's travel began and ended in Minnesota—including his trips to Florida. In August 2004, Mauer purchased a second Florida townhome located in the same Fort Myers development as the townhome that he purchased in July 2003.

In October 2005, following an inquiry by the Minnesota Department of Revenue, Mauer filed a 2003 Minnesota individual income tax return as a "part-year" resident. Mauer did not file a Minnesota individual income tax return for 2004. After conducting an audit, the Commissioner issued an audit report in which he determined that Mauer was a full-time legal resident of Minnesota for the 2003 and 2004 tax years. Mauer filed an administrative appeal challenging the result of the audit report, and the Commissioner once again determined that Mauer was a full-time resident of Minnesota for all of the 2003 and 2004 tax years. Mauer appealed the decision to the tax court and a two-day trial was held on January 12–13, 2011. More than one year later, on January 20, 2012, the tax court rendered its decision affirming the Commissioner's determination. Mauer then appealed to our court.

## I.

We review tax court decisions involving questions of fact to determine if there is sufficient evidence to support the court's decision. *Sanchez v. Comm'r of Revenue*, 770 N.W.2d 523, 525 (Minn.2009) (citing *Miller's Estate v. Comm'r of Taxation*, 240 Minn. 18, 20, 59 N.W.2d 925, 926 (1953)). We review the court's conclusions of law and interpretations of statutes de novo. *Id.* Whether a taxpayer's new residence in a different state results in a change in the taxpayer's domicile is " 'ordi-

---

1. There is a discrepancy in the record. Mauer's handwritten travel log does not show a visit to Fort Myers by Mauer before February 22. However, a computer-generated travel log that is also in the record indicates that Mauer returned to Fort Myers on January 30.

narily a question of fact, depending ... upon the purpose and intent of the change.'" *Id.* (quoting *Davidner v. Davidner*, 304 Minn. 491, 494, 232 N.W.2d 5, 7 (1975)).

■ Mauer acknowledges that the question of a taxpayer's domicile is primarily a question of fact, and devotes most of his brief to disputing the sufficiency of the evidence used by the tax court to reach its determination. Mauer also asserts that the tax court's decision is not supported by law. But the factors Mauer cites—the court's failure to consider his acts and declarations and the court's improper weighing of how much time he spent in Minnesota, known as "factor W"—are within the court's fact-finding authority and thus we will uphold the court's determinations if they are supported by sufficient evidence. *See Dreyling v. Comm'r of Revenue (Dreyling I)*, 711 N.W.2d 491, 495–96 (Minn.2006) (considering factors weighed by the tax court on a "justified by the evidence" standard); *Dreyling v. Comm'r of Revenue (Dreyling II)*, 753 N.W.2d 698, 701, 703–04 (Minn.2008) (reviewing domiciliary and other fact issues resolved by the tax court on a sufficiency-of-the-evidence basis).

■ In Minnesota, a person is a resident for tax purposes if he or she is "domiciled in Minnesota" during the relevant tax period. Minn.Stat. § 290.01, subd. 7 (2012). Under Minnesota law, domicile

> means the bodily presence of an individual person in a place coupled with an intent to make such a place one's home. The domicile of any person is that place in which that person's habitation is fixed, without any present intentions of removal therefrom, and to which, whenever absent, that person intends to return.

Minn. R. 8001.0300, subp. 2 (2011); *accord Larson v. Comm'r of Revenue*, 824 N.W.2d

329, 331 (Minn.2013) (discussing domicile); *Sanchez*, 770 N.W.2d at 525–26 (citing domicile definition). We have held that once an individual's domicile is established in Minnesota, "it is presumed to continue until another domicile is actually established." *Sanchez*, 770 N.W.2d at 526. We have also held that, "where there are definite statements of intent to make a new abode one's home, the trier of fact may consider the acts and circumstances of that person in evaluating the sincerity of the announced intent." *Comm'r of Revenue v. Stamp*, 296 N.W.2d 867, 869 (Minn.1980). When the tax court considers the acts and circumstances of the taxpayer and weighs their impact either in favor of or against a change in domicile, it is the "taxpayer [who] has the burden of proving a new domicile outside of Minnesota." *Sanchez*, 770 N.W.2d at 526.

■ The parties have stipulated that Mauer "was a Minnesota resident and domiciliary through July 11, 2003." Thus, under *Sanchez*, Mauer carries the burden of proving that he established a new domicile outside of Minnesota after that date. *Id.* To meet his burden, Mauer need not prove that he has abandoned his Minnesota residence, but he must rebut the presumption that he has not changed his domicile by proving he has established domicile in another state—in this case Florida. *See Sandberg v. Comm'r of Revenue*, 383 N.W.2d 277, 283 n. 7 (Minn.1986).

As we proceed with our analysis, we will first discuss the arguments raised by the parties, followed by a review of the Department of Revenue's factors for determining a taxpayer's domicile that are relevant to this case. Next, we will consider the implications of Mauer's dispute with the NBA and several other factors raised by the parties, and then finish by summar-

izing our conclusions about the sufficiency of the support for the tax court's decision.

## A. Parties' Arguments

Mauer asserts that his acts and declarations show his clear intent to make Florida his domicile as of July 2003. Specifically, Mauer argues that his physical acts and declarations, such as purchasing a townhome in Fort Myers, Florida, registering to vote in Florida, registering one of his cars in Florida, filling out a Florida homestead application, decorating his Fort Myers townhome, and disputing his residence with the NBA, all buttress his repeated written and oral statements that he considered himself to be a Florida domiciliary. These statements include a Florida Declaration of Domicile, Mauer's repeated representations to the NBA, and his successful defense of those representations. Mauer then examines the Department of Revenue's 26 factors for determining domicile. He asserts that a thorough consideration of these factors shows that he established a Florida domicile in July 2003. Mauer concludes by arguing that, when all the evidence is viewed as a whole, there is insufficient evidence to support the tax court's decision.

Mauer and the dissent place great emphasis on Mauer's dispute with the NBA about travel reimbursements. Mauer asserts that his repeated statements to the NBA—and the fact that he was willing to risk sanctions, up to and including the termination of his employment—all contribute to a showing that he was devoted to establishing that he was a Florida resident. Mauer acknowledges that he maintained strong ties to Minnesota after July 2003, including spending significant time in Minnesota, maintaining many business and professional relationships here, and keeping and maintaining his Afton home. But Mauer asserts that the tax court failed to consider as a whole the fact that his long-standing connections to Minnesota made it impossible for him to end all of these relationships quickly.

The Commissioner argues that Mauer bears the burden of proving that he was a Florida domiciliary, that Mauer did not meet his burden, and that there was more than sufficient evidence to support the tax court's decision. Specifically, the Commissioner argues that Mauer's maintenance of his Afton home, his seemingly negligible efforts to sell that home, the significant time he spent in Minnesota after June 2003, his personal and business connections in Minnesota, his motor vehicles kept in Minnesota, and his financial accounts in Minnesota all combined to provide sufficient evidence in support of the court's determination that Mauer remained domiciled in Minnesota for the 2003 and 2004 tax years.

## B. Application of the Department of Revenue's Factors for Determining Domicile

■■■ The Department of Revenue has articulated 26 factors to weigh when considering an individual's domiciliary status in Minnesota. *See* Minn. R. 8001.0300, subp. 3 (2011); *accord Sanchez,* 770 N.W.2d at 526. The parties argue at length over the applicability and weight of these factors. The application of the Department of Revenue's 26 factors is a question of fact for the tax court to decide. *See Larson,* 824 N.W.2d at 331 (citing *Sanchez,* 770 N.W.2d at 525). We have rejected the notion that "the sheer quantity of factors favoring nondomiciliary status outweighs the factors favoring domicile in Minnesota." *Dreyling I,* 711 N.W.2d at 495. We have held that "[n]othing in either the statute or the rules supports such a formulaic approach." *Id.* Rather, the factors are a "nonexclusive" list, and the

list aids "in the determination of domicile." *Id.* at 494; *see also Larson,* 824 N.W.2d at 333–34 (citing *Dreyling I* ). The factors must be weighed in each particular case, and "the trier of fact may consider the acts and circumstances of that person in evaluating the sincerity of the [taxpayer's] announced intent." *Stamp,* 296 N.W.2d at 869. Because domicile is a question of fact, we review application of the factors under a sufficiency-of-the-evidence standard. *Larson,* 824 N.W.2d at 331.

When the tax court applied the 26 factors to Mauer, the court concluded that 8 weigh in favor of a Minnesota domicile, 6 weigh in favor of a Florida domicile, 6 were neutral, and 6 did not apply. The parties agree that 6 factors weigh in favor of a Florida domicile and 6 do not apply. But the parties disagree about how many of the remaining 14 factors weigh in favor of a Minnesota domicile and how many are neutral. Mauer agrees with the tax court that 3 factors weigh in favor of a Minnesota domicile, but asserts that the other 11 are neutral. The Commissioner argues that 10 factors weigh in favor of a Minnesota domicile and only 4 are neutral. We will briefly review the 5 factors that the tax court found weigh in favor of a Minnesota domicile, but that Mauer disputes in this appeal (factors G, M, Q, T, and U). Next we will briefly review the 2 factors that the tax court found are neutral, but that the Commissioner asserts favor a Minnesota domicile (factors E and S). We will then conclude this section by discussing one factor that all parties agree weighs in favor of a Minnesota domicile, but which the parties discuss at length—the percentage of time spent in Minnesota and other locations (Factor W).

### 1. Factor G

Factor G is the "present status of the former living quarters, i.e., whether it was sold, offered for sale, rented, or available for rent to another." Minn. R. 8001.0300, subp. 3. The tax court found this factor favors a Minnesota domicile. The parties debate the significance of Mauer's maintenance of the Afton home and his efforts to sell the home. The Department of Revenue's rule offers the example of a taxpayer who lists a home for sale with a real estate broker at fair market value and states that such good-faith efforts coupled with removal of the taxpayer's belongings from the home could be sufficient for the taxpayer to establish a domicile elsewhere. Minn. R. 8001.0300, subp. 10 (2011). However, Mauer's activities are distinguishable from this example. Mauer did not contract with a licensed real estate broker. Mauer "did not want to hear" his licensed realtor's advice about the appropriate price at which to list the Afton home. Mauer removed some items from the Afton home, but continued to spend upwards of 181 days per year there and kept enough personal property in the home to have that property insured for $1.6 million. We have not held that a taxpayer is *required* to sell his Minnesota residence to establish domicile in another state, especially when the taxpayer has sufficient means to maintain more than one home. But we conclude that Mauer's efforts to sell his Afton home are insufficient to weigh in favor of a Florida domicile and against the presumption that he was still a Minnesota domiciliary during the disputed time frame in 2003 and 2004. As the Department's rule makes clear, an actual, good-faith effort to sell a home can help to demonstrate a taxpayer's intent to change his or her domicile. *Id.* But such an effort is not present here. Therefore, we conclude there was sufficient support for the tax court's finding that Factor G favored a Minnesota domicile.

### 2. Factor M

■ Factor M is the "jurisdiction from which any motor vehicle license was issued and the actual physical location of the vehicles." Minn. R. 8001.0300, subp. 3. The tax court found that this factor favored a Minnesota domicile. Mauer maintained at least two out of his four motor vehicles in Minnesota and insured three of them under a Minnesota policy. Mauer's fourth vehicle was maintained in Florida and insured under a Florida insurance policy. Considering the relative makes, models, and years of Mauer's Minnesota vehicles, it is fair to presume that the Minnesota vehicles were Mauer's primary motor vehicles. Given the greater number of vehicles that Mauer maintained, licensed, and insured in Minnesota during the relevant time frame, we conclude there was sufficient support for the tax court to find that Factor M favored a Minnesota domicile.

### 3. Factor Q

■ Factor Q is the "location of any bank accounts, especially the location of the most active checking account." Minn. R. 8001.0300, subp. 3. The tax court found that this factor weighs in favor of a Minnesota domicile. The court found that Mauer had two bank accounts in Minnesota, one in Florida, and that the most active bank accounts were in Minnesota. Mauer also maintained a line of credit based in Minnesota. Mauer contends that this factor is neutral because he had accounts in both Minnesota and Florida and had his pay deposited evenly between the two states. But, given that Mauer had a greater number of accounts in Minnesota and by far his most active checking account was here, we conclude there was sufficient support for the tax court to find that Factor Q favors a Minnesota domicile.

### 4. Factor T

■ Factor T is the "location of business relationships and the place where business is transacted." Minn. R. 8001.0300, subp. 3. The tax court found that this factor weighs in favor of a Minnesota domicile. The court found that Mauer used the services of five professionals in Minnesota and two in Florida. While the overall impact of this factor is open to dispute, we conclude that given the greater number of professional relationships in Minnesota there was sufficient support for the tax court to find that Factor T favors a Minnesota domicile.

### 5. Factor U

■ Factor U is the "location of social, fraternal, or athletic organizations or clubs or in a lodge or country club, in which the person is a member." Minn. R. 8001.0300, subp. 3. The tax court found that this factor weighs in favor of a Minnesota domicile. Mauer was a member of the Minnesota Officials Association and/or the Capital City Officials Association during the tax periods at issue. Mauer owns a club membership for each of his Fort Myers properties, but these memberships are required as a condition of his ownership of the Florida townhomes. Mauer contends that Factor U is neutral because he has memberships in approximately equal numbers in the two states. Because Mauer was voluntarily a member of his Minnesota organizations but was required to join the Florida organizations, we conclude there was sufficient support for the tax court to find that Factor U favors a Minnesota domicile.

### 6. Factor E

■ Factor E is the "location of employment." Minn. R. 8001.0300, subp. 3. The tax court found that this factor was neutral. Mauer was employed by the

NBA as a referee, which employment required him to travel extensively nationwide. The Commissioner contends that this factor weighs slightly in favor of a Minnesota domicile because, during the time in issue, Mauer had secondary employment in Minnesota as a referee for high school football games. While a de novo review might lean toward this factor favoring a Minnesota domicile, we conclude that because Mauer's primary employment was national in nature, there was sufficient support for the tax court to find that Factor E is neutral.

### 7. Factor S

Factor S is the "location of the place of worship at which the person is a member." Minn. R. 8001.0300, subp. 3. Mauer contends that this factor is neutral, the tax court did not mention this factor, and the Commissioner argues that this factor weighs in favor of a Minnesota domicile. Mauer attended church in Florida, but also attended a Minnesota church every Sunday that he was in Minnesota. During the time period in issue there were 78 Sundays. Of those 78 Sundays, Mauer was in Minnesota for 37 of them, in Florida for 17, and elsewhere for 24. Because the greater number of Sundays that Mauer was in Minnesota is already taken into consideration by Factor W—as discussed below—we will not disturb the tax court's de facto finding through silence that Factor S is a neutral factor.

### 8. Factor W

■ Factor W is the "percentage of time (not counting hours of employment) that the person is physically present in Minnesota and the percentage of time (not counting hours of employment) that the person is physically present in each jurisdiction other than Minnesota." Minn. R. 8001.0300, subp. 3. The tax court found

that this factor favors a Minnesota domicile, and both parties agree. But the parties spend a significant amount of time discussing this factor. Mauer acknowledges that Factor W weighs in favor of Minnesota domicile, but argues that application of Factor W "is problematic in this case" and that "this single factor cannot be given determinative weight." We agree and again note that no factor is dispositive and that the factors are considered together with the tax court's judgment about the sincerity of the taxpayer's statements and purported efforts to change domicile. Id. In all of 2003, Mauer spent 55.6% of his time in Minnesota. From July 1 to December 31, 2003, Mauer spent 46.2% of his time in Minnesota, 14.1% of his time in Florida, and 40% of his time in other locations. During 2004, Mauer spent 49.5% of his time in Minnesota, 17.5% of his time in Florida, and 33.1% of his time in other locations. Our analysis of the percentage of time spent in Minnesota shows Mauer spent a large plurality of his time here— significantly more than in any other location, especially Florida, the location where Mauer is attempting to prove he established his domicile.

While many factors can combine to either reinforce or rebut the presumption that a taxpayer's domicile has not changed, we carefully examine any efforts by a taxpayer presumptively domiciled in Minnesota to rebut that presumption when the taxpayer spends *fewer* days in the new state than he does in Minnesota. *See Larson*, 824 N.W.2d at 332 (noting that taxpayer "spent more time in Minnesota than he did" in the state he was claiming as his domicile). Just as in *Luther v. Commissioner of Revenue*, where we held that travel days spent partially in Minnesota count as time spent in the state and were skeptical of the taxpayer's attempt to count such travel days as days outside of Minnesota, we will also be skeptical when

a taxpayer spends more time in Minnesota than in his asserted new domicile. *See Luther v. Comm'r of Revenue*, 588 N.W.2d 502, 508 (Minn.1999).

■■■ Importantly, during the time period relevant to this dispute, Mauer spent significantly more time in Minnesota than he did in Florida. The question for us on appeal is whether the greater percentage of time spent in Minnesota provided a sufficient basis for the tax court to find that Mauer had not carried his burden to rebut the presumption that he was a Minnesota domiciliary. In 2003, Mauer spent a majority of his time in Minnesota. In the latter half of 2003 and all of 2004, he spent far more time in Minnesota than in any other location. Therefore, we conclude that while this one factor is not conclusive, there was sufficient support for the tax court's weighing of Factor W in favor of its finding that Mauer remained domiciled in Minnesota for all of 2003 and 2004.

The tax court and the parties agree that 6 factors favor a Florida domicile and 6 do not apply; thus, there is no need for us to analyze the sufficiency of the support for the court's finding with respect to those factors. After considering the 14 factors that are disputed in this case, we conclude there was sufficient support for the court to find that 8 of those factors favor a Minnesota domicile and 6 are neutral.

### C. NBA Travel–Expense Dispute

Under Mauer's version of events, the most dramatic action that he took to establish his domicile in Florida involved his conflict with the NBA over travel expenses. Mauer asserts that he was willing to put his job as a referee with the NBA at risk in order to demonstrate his move to and establishment of domicile in Florida. The Commissioner advances an alternative understanding of these events, contending that money, not domicile, was at the core of Mauer's dispute with the NBA over travel expenses. Specifically, the Commissioner asserts that by designating Fort Myers as his home airport when he was in fact traveling in and out of Minnesota, Mauer was attempting to receive a higher travel allowance than he would otherwise have been entitled to. It is undisputed that at all times relevant to the travel-expense dispute, Mauer was more frequently traveling in and out of Minnesota than he was traveling in and out of Florida. The tax court made a finding to this effect and we agree with that finding. This finding means that for Mauer to tell the NBA that he was traveling in and out of Florida was at best questionable and at worst a misrepresentation—and this is true even if Mauer's motivation was not primarily pecuniary in nature.

The NBA believed that Mauer's travel arrangement—living in Minnesota but representing that Florida was his residence for purposes of his travel expenses—resulted in Mauer receiving higher reimbursements than he was entitled to, a belief that motivated the NBA to threaten Mauer with severe sanctions. While Mauer was eventually able to produce a travel-cost summary indicating that the Fort Myers designation did not benefit him financially, this report was *in response* to the NBA's threat of sanctions. It is not clear how or whether Mauer knew before switching his reimbursements to reflect Fort Myers-based travel that such an arrangement did not result in undue reimbursements to him. Mauer has not produced an accounting during the course of this dispute that shows he conducted a calculation or review of this travel arrangement to be certain that his misrepresentation would not adversely affect his employer *before* the NBA threatened se-

vere sanctions—including possible termination of employment.

■ The tax court only made factual findings about the NBA travel-expense dispute, not the underlying motivating factors for the dispute. On such an issue, we defer to the court's assessment of the taxpayer's sincerity and credibility, and the court's weighing of relevant factors. *Manthey v. Comm'r of Revenue,* 468 N.W.2d 548, 550 (Minn.1991). Accordingly, we conclude there was sufficient support for the court's finding that Mauer's dispute with the NBA is a neutral factor when making a determination of domicile. In other words, we conclude that the NBA travel-expense dispute is not a significant factor, one way or the other, when determining Mauer's domicile during the 2003 and 2004 tax years.

### D. Other Factors

Before summarizing our analysis of the sufficiency of the evidence, it is necessary to review the additional acts and circumstances Mauer asks us to weigh when determining his domicile. Mauer asks us to consider his reasons for wanting to leave Minnesota and move to Florida and certain other actions he took to establish Florida as his domicile. Mauer also claims there were several other good reasons why he wanted to establish his domicile in Florida. He cites his longstanding dislike of Minnesota's cold weather, that he was embittered over his conviction on federal tax charges by a Minnesota jury, and that his cousin's professional baseball career all gave him a good reason for moving to Fort Myers.

Mauer asserts that he has had a longstanding dislike of Minnesota's cold climate. He testified that his feet were partially frostbitten when he was 10 years old and that Minnesota is an unpleasant place to return to during his extensive winter-season travels. Mauer stated that before 2001, he looked at homes in Texas, California, on both coasts of Florida, and in Arizona, with the presumed intent to purchase a home in one of these warmer locations as his permanent residence. A Florida location ultimately became the clear choice when the Minnesota Twins drafted his cousin, because the Twins hold their annual spring training camp in Fort Myers. Mauer's cousin had purchased a home in the same Fort Myers development where Mauer later purchased a townhome. Lastly, Mauer argues that the decision by the United States Attorney for Minnesota to prosecute him, and Mauer's subsequent conviction by a Minnesota jury, "left a bad taste in [his] mouth" with respect to Minnesota. Mauer asserts that this "bad taste" was relevant to him because most of the other NBA referees were not charged with a crime, and a Pennsylvania jury acquitted the only other NBA referee actually to go to trial on charges related to the federal investigation.

We conclude that Mauer's assertion about his distaste for Minnesota and its cold weather is undermined by the fact that, during the disputed time frame, Mauer continued to spend significant time in Minnesota, including time he spent in Minnesota during some of the coldest months of the year. During the 2003–04 winter season, except for a New Year's "vacation" to Fort Myers and an early March trip to Florida, Mauer scarcely spent more than a night or two at a time in Florida—while he routinely returned to Minnesota for four, five, or even six nights at a time.

There is little doubt that Mauer established a motive to become domiciled in Florida; but, while motive and intent are often confused and used synonymously in ordinary speech, motive and intent are different. *See Toll v. Moreno,* 284 Md. 425,

397 A.2d 1009, 1018 (1979) (noting that "subjective intent," meaning mere aspiration, is not sufficient to establish domicile); *Snakenberg v. Hartford Cas. Ins. Co.*, 299 S.C. 164, 383 S.E.2d 2, 7 & n. 7 (Ct.App. 1989). As the South Carolina Court of Appeals has explained, "[o]ne reason intent . . . and motive are often confused is that they are used synonymously in ordinary speech." *Snakenberg*, 383 S.E.2d at 7 n. 7. But the difference is significant—motive is "the inducement for doing an act" while intent "is the resolve to commit an act." Bryan A. Garner, *Garner's Dictionary of Legal Usage* 469 (3d ed.2011).

▬▬ Here, it is worth examining the types of actions Mauer took and the declarations he made and the resolve behind those acts and declarations. Mauer purchased a townhome in Florida, registered to vote in Florida, completed a declaration of domicile in Florida, terminated the Minnesota homestead exemption on his Afton home, and opened a bank account in Florida. But like the taxpayer in *Larson*, Mauer's acts, other than purchasing a townhome in Florida, mainly required making an assertion or signing a document, or both. *See Larson*, 824 N.W.2d 329. Even with the purchase of the Fort Myers townhome, Mauer did not attend the closing in Florida. As we noted in *Larson*, the Department's rules make clear that a taxpayer may express his intent to change domicile through both acts and declarations, and "of these 'two forms of evidence, acts must be given more weight than declarations.' " 824 N.W.2d at 332 (quoting Minn. R. 8001.0300, subp. 2). Here, Mauer did not sell his Afton home— nor does it appear as though he made a good-faith effort to sell it; he continued to spend significantly more time in Minnesota than in Florida, including considerable time during the winter season despite asserting that he wanted to avoid Minnesota

in the winter; he kept and insured several motor vehicles in Minnesota; and he maintained employment in Minnesota by refereeing high school football games. When considering the foregoing facts, we conclude that Mauer's acts, as opposed to his declarations, weigh in favor of the presumption that Mauer's domicile remained in Minnesota. Taken together, these facts provide more than sufficient support for the tax court's determination that Mauer remained domiciled here. In other words, when Mauer's intentions are measured by his actual behavior, they do not match his possible motive or stated intentions to establish his domicile in Florida.

### E.   Other Concerns

Mauer and the dissent specifically express concern that the Commissioner's inconsistent application of the factors in Minn. R. 8001.0300, subp. 3, leaves individuals without a clear guide for how to establish or defeat Minnesota domiciliary status. Such concern is overstated. We have previously noted that " '[n]o positive rule can be adopted with respect to the evidence necessary to prove an intention to change a domicile.' " *Dreyling I*, 711 N.W.2d at 495 (quoting Minn. R. 8001.0300, subp. 2). We acknowledge that any inquiry about a taxpayer's domicile will be an intensive fact-specific inquiry and that the results of such fact-specific inquiries may not always be as precise as we would hope. But the factors do have merit and do provide guidance.

▬▬ Mauer also expresses concern that, if we affirm the tax court's decision, Minnesota taxpayers who wish to establish their domicile in other states will not have any guidance or predictability about how to do so. We disagree. While domicile involves intention, as the Department's rule states, "[t]he mere intention to acquire a new domicile, without the fact of

physical removal, does not change the status of the taxpayer, nor does the fact of physical removal, *without the intention to remain,* change the person's status." Minn. R. 8001.0300, subp. 2 (emphasis added). Even though Mauer was motivated to establish his domicile in Florida, sought professional advice on how to do so, and took steps to follow that advice, there are several well-established, reasonable, and concrete steps that a taxpayer can take in order to establish domicile—steps that Mauer did not take. These steps, which can demonstrate a credible and sincere resolve to establish a change in domicile, include spending more time in one's new state than in Minnesota, the "physical removal" described in the rule, demonstrating a good-faith effort to sell or rent an existing Minnesota residence, and making significant and credible efforts to move one's life outside of Minnesota. Such steps can be furthered by establishing new social connections in the new state, moving more than just "some" personal belongings to the new state, and moving one's primary motor vehicles to the new state. Mauer's concern that taxpayers will be left without guidance lacks merit, and it is well-worth noting again that once domicile is established in Minnesota, that domiciliary status creates a rebuttable presumption. *Sanchez,* 770 N.W.2d at 526 ("[A] party does not need to prove *abandonment* of present domicile, but, instead, rebut[ ] the presumption that he or she has not changed

domicile by proving establishment of domicile in another jurisdiction." (alteration in original) (citation omitted) (internal quotation marks omitted)); *Sandberg,* 383 N.W.2d at 283 ("Once a domicile is established, it is presumed to continue until establishment of a new domicile is proved . . . .").[2]

In sum, domicile is a question of fact, and our standard of review requires us to affirm the tax court's factual determination when there is sufficient support in the record to support that determination. Here, the parties do not dispute that until July 2003, Mauer was a Minnesota domiciliary. The law presumes that Mauer continued to be domiciled in Minnesota for the remainder of 2003 and for 2004, unless he can satisfy the burden of rebutting this presumption with sufficient evidence by proving that he has established his domicile elsewhere. But Mauer continued to call Minnesota "home" and maintained, furnished, and spent a significant plurality of his time in the same home in Minnesota that he had occupied before the disputed time frame. For instance, Mauer spent 49.5% of 2004 in Minnesota, or less than two days shy of one-half of the year—and significantly more time in Minnesota than the 17.5% of 2004 that he spent in Florida. While Mauer traveled extensively, he flew in and out of Minnesota, using his Afton home as his base, as well as the location

**2.** As we end our opinion, we need to make one final point. We disagree with the dissent's characterization of the Commissioner's actions as arbitrary. That said, we acknowledge and agree with the dissent's desire to convey to both the Commissioner and the tax court that they must strive to apply the Department's factors in a consistent and equitable manner. For taxpayers to have trust and confidence that Minnesota's tax system is fairly and equitably applied to all, it is vitally important that taxpayers be able to understand the Department's factors and how those factors are applied in any given situation. Such an understanding is important so that taxpayers can adjust their expectations, intentions, and actions accordingly. But in this case, given Mauer's intent—as demonstrated through his actions—any concern about the application of the factors does not rise to the level warranting reversal. When all is said and done, there is more than sufficient evidence in the record to support our decision to affirm the result reached by the Commissioner and the tax court.

for most of his motor vehicles. Mauer kept most of his financial accounts in Minnesota. While Mauer may have been motivated to move to Florida and offered explanations about why he has maintained various Minnesota connections, the tax court has deemed these expressions and explanations insufficient to satisfy the burden of proof he bears. We agree.

■■■ We have held that "[t]he tax court sits in a better position to judge credibility and sincerity" and that the tax court will be upheld when "its decision is supported by the evidence as a whole." *Manthey*, 468 N.W.2d at 550. Here, the evidence as a whole supports the tax court's determination. Accordingly, we conclude that there was more than sufficient evidence in the record for the tax court to find that Mauer remained domiciled in Minnesota for all of the 2003 and 2004 tax years. Therefore, we hold that the tax court did not err when it held that Mauer was domiciled in Minnesota during all of the 2003 and 2004 tax years.

Affirmed.

PAGE, J., took no part in the consideration or decision of this case.

ANDERSON, G. BARRY, Justice (dissenting).

Because I conclude that Kenneth B. Mauer properly established Florida as his state of domicile, I respectfully dissent.

I agree that the majority has correctly set out the prevailing law regarding change of domicile and also agree, as the majority states, that the burden is on the taxpayer to establish a change of domicile. In my view, the record demonstrates that he has done just that, but both the tax court and the majority here have gotten lost in the detail of the 26–factor "test" (more about that later), while ignoring major events experienced by Mauer that demonstrate that he changed his domicile.

First, it is striking that here Mauer was released from home confinement on the federal conviction on June 30, 2003, and he was on a plane to Florida the *next day*. Two days later, he signed a purchase agreement to buy a home in Florida and, over the next several weeks, he took actions consistent with a change of domicile—relinquishing his Minnesota homestead exemption, applying for a Florida homestead exemption, applying for a Florida driver's license, registering to vote in Florida, documenting his change of domicile with his employer in several different ways, and moving his personal belongings to his new home in Florida.

But second, and more importantly, this domicile dispute features something rarely seen in our case law: Mauer was engaged in a long-running, and noisy, argument with his employer about his decision to live in Florida. In fact, the issue escalated to threats from the NBA to fine Mauer, suspend Mauer, or even terminate Mauer's employment, yet he continued to insist that he was domiciled in Florida, not Minnesota, notwithstanding the potential employment-related consequences.

I agree with the majority that actions matter, and Mauer's actions here in moving to Florida immediately after home confinement and his willingness to do battle with his employer on the residence issue lead me to "a definite and firm conviction that a mistake has been committed" by the tax court in rejecting Mauer's change-of-domicile claim. *Kmart Corp. v. Cnty. of Becker*, 709 N.W.2d 238, 241 (Minn.2006) (citation omitted) (internal quotation marks omitted). I would reverse the tax court for these two reasons alone.

A word needs to be said about factor W, which purports to measure residency time in both states and on which the majority

relies heavily in affirming the tax court. The majority correctly reports the data, which supports the claim that a plurality of Mauer's time during the disputed tax periods was spent in Minnesota, but it does not acknowledge that Mauer has consistently said that he does not intend to reside in Florida in the summer. It is also worth noting that Mauer's unusual occupation requires extensive travel that undercuts the traditional approach of simply adding up the number of days in any one location. These unique circumstances do not invalidate factor W, and Mauer admits that this factor weighs against him. But given those unique circumstances, this factor is of limited relevance here, at least if we are serious about our oft-repeated assertion that no one factor is controlling in domicile decisions.

Finally, and more broadly and more important than Mauer's specific circumstances, a 26–factor domicile test is no test at all. It is not clear that the result here makes the problem worse for other taxpayers, but the current approach to domicile by the Commissioner is hardly "common sense," as the Commissioner has suggested. *Accord State v. Enyeart,* 676 N.W.2d 311, 321 (Minn.App.2004) (stating that application of the domicile rule is governed by "common sense"). Taxpayers in Minnesota enter the domicile swamp at their own peril.

The Commissioner's interpretative practices as applied to the domicile rule can only be described as arbitrary. Here, the Commissioner minimizes documentary declarations of domicile, such as the address on a driver's license, because Mauer is in compliance with that factor; in other cases, the Commissioner emphasizes a failure to change a driver's license address as evidence of no change in domicile. *E.g., Syfco v. Comm'r of Revenue,* No. 4624, 1987 WL 5138, at *6 (Minn. T.C. Feb. 11, 1987). Similarly, the Commissioner dismisses Florida homestead status as an easily met requirement. But if the taxpayer has not changed his or her homestead status, unlike here, then that failure is treated by the Commissioner as evidence of no change in domicile. *Page v. Comm'r of Revenue,* No. 4011, 1986 WL 15695, at *7 (Minn. T.C. Mar. 12, 1986).

I recognize we give substantial deference to the tax court on fact-intensive issues like domiciliary status. But where, as here, the unique circumstances of Mauer's employment and his life experiences demonstrate his intent to change his domicile, I conclude that the tax court erred in rejecting Mauer's claim of Florida domicile and the tax court should be reversed.

For these reasons, I respectfully dissent.