Fowler v. N.C. Dep't of Revenue, 2014 NCBC 36.

STATE OF NORTH CAROLINA
WAKE COUNTY

GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
13 CVS 10989

STEVE W. FOWLER and
ELIZABETH P. FOWLER,

　　　　　　　　Petitioners,

v.

NORTH CAROLINA DEPARTMENT
OF REVENUE,

　　　　　　　　Respondent.

**ORDER ON PETITION FOR REVIEW
OF FINAL DECISION**

{1}　　THIS MATTER is before the court on the Petition for Judicial Review of a Final Agency Decision in this contested tax case arising under N.C. Gen. Stat. § 105-241.16 (2013).

> *Robinson, Bradshaw & Hinson, P.A. by John R. Wester and Thomas Holderness for Petitioners Steve W. Fowler and Elizabeth P. Fowler.*
>
> *North Carolina Department of Justice by Andrew O. Furuseth and Perry J. Pelaez for Respondent North Carolina Department of Revenue.*

Gale, Judge.

## I.　INTRODUCTION

{2}　　This matter involves the dispute between Petitioners Steve W. Fowler and Elizabeth P. Fowler (collectively "the Fowlers" or "Petitioners") and Respondent North Carolina Department of Revenue ("Department" or "Respondent"). The question before the court is whether Petitioners changed their domicile from North Carolina to Florida on or about January 20, 2006, exempting them from taxes arising from income received and gifts made in connection with the sale of Mr. Fowler's majority interest in his company, which closed on February 3, 2006.

{3}     Respondent acknowledges that Petitioners ultimately intended to change their domicile to Florida at some point in the future, but that they had no intent to and did not abandon their domicile in North Carolina at a time that avoids the taxes in question.  Petitioners acknowledge substantial continuing activities in North Carolina after their change of domicile to Florida, but maintain they remained in the state for temporary and transitory activities necessitated by the terms of the sales transaction.

{4}     The various factual events developed in the Official Record are largely undisputed.  The dispute hinges on the legal significance of those facts and their adequacy to support the claimed change of domicile.  The Administrative Law Judge ("ALJ"), Beecher R. Gray, heard several days of evidence and issued a decision in Petitioners' favor ("ALJ Decision").  Respondent rejected the ALJ Decision and issued its Final Agency Decision upholding the imposition of taxes against Petitioners as North Carolina residents.  The court must now make its own factual and legal determinations based on the Official Record.

## II.     PROCEDURAL HISTORY

{5}     Following audits for the 2006 and 2007 tax periods, Respondent, on October 27, 2011, issued Notices of Final Determination ("Final Determination") that Petitioners owed the taxes subject to this action.

{6}     On December 21, 2011, Petitioners filed a Petition for Contested Case Hearing in the Office of Administrative Hearings, pursuant to N.C. Gen. Stat. § 150B-23(a), challenging the Final Determination.

{7}     On December 22, 2011, the Office of Administrative Hearings accepted Petitioners' petition for a contested case hearing and assigned Judge Gray to preside.  (Pet. Contested Case Hr'g, *Fowler v. N.C. Dep't of Revenue*, No. 11 REV 14832 (N.C. Office Admin. Hearings Dec. 22, 2011).)

{8}     Judge Gray heard evidence for six days beginning on November 13, 2012, and issued the ALJ Decision in Petitioners' favor on December 31, 2012.

*Fowler v. N.C. Dep't of Revenue*, No. 11 REV 14832 (N.C. Office Admin. Hearings Dec. 31, 2012).

{9} Following its receipt of the complete official record on March 19, 2013, the Department filed its Exceptions to the ALJ Decision on May 7, 2013, and its Final Agency Decision on July 17, 2013, rejecting the ALJ Decision and sustaining the tax, penalties, and interest. *Fowler v. N.C. Dep't of Revenue*, No. 11 REV 14832 (N.C. Dep't of Revenue July 17, 2013) ("Final Agency Decision").

{10} On August 14, 2013, Petitioners filed their Petition for Judicial Review of the Final Agency Decision pursuant to N.C. Gen. Stat. § 150B-45 (2013).

{11} The matter was assigned to the undersigned on August 23, 2013. The complete Official Record has been filed, the respective positions have been fully briefed, the court has heard oral argument, and the matter is ripe for disposition.

## III. STANDARD OF REVIEW

{12} The standard of review for this matter is established by N.C. Gen. Stat. § 150B-51(c) as it was in effect when the administrative proceeding was initiated on December 21, 2011.[1] N.C. Gen. Stat. § 150B-51(c) (2011) (repealed 2011, eff. Jan. 1, 2012). That statute provides that where an agency rejects an ALJ's decision, "the court shall review the official record, de novo, and shall make findings of fact and conclusions of law. In reviewing the case, the court shall not give deference to any prior decision made in the case and shall not be bound by the findings of fact or the conclusions of law contained in the agency's final decision." *Id.* Under this standard of review, the superior court "considers the matter anew[] and freely substitutes its own judgment for the agency's." *N.C. Dep't of Env't & Natural Res. v. Carroll*, 358 N.C. 649, 658, 599 S.E.2d 888, 894 (2004) (quoting

---

[1] This places the matter in the time window when the Superior Court reviews final agency decisions rejecting an ALJ decision in the nature of original jurisdiction, as opposed to in the nature of an appellate court, as is more typical in judicial review of administrative decisions. Section 150B-51 was substantially amended effective January 1, 2012, eliminating the standard of review applicable to this matter and returning to the more traditional standard where the court's de novo review is limited to legal errors. *See N.C. Dep't of Env't & Natural Res. v. Carroll*, 358 N.C. 649, 599 S.E.2d 888 (2004).

*Mann Media, Inc. v. Randolph Cnty. Planning Bd.*, 356 N.C. 1, 13–14, 565 S.E.2d 9, 17 (2002)). The court must make independent findings of fact and conclusions of law. *Id.* at 663, 599 S.E.2d at 897. However, its findings must be based on the administrative record. N.C. Gen. Stat. § 150B-36(b1) (2011) (repealed 2011, eff. Jan. 1, 2012). Any finding of fact the ALJ made that the agency does not reject in the manner provided by statute is deemed accepted for purposes of judicial review. *Id.* After making the requisite findings and conclusions, the court may "affirm the decision . . . or remand the case" for further proceedings or it may "reverse or modify the decision." *Id.* § 150B-51(b) (2011).

## IV.    STATEMENT OF ISSUES

{13}    The court addresses the following issues: (1) whether Petitioners have sustained their burden of proving a change of domicile from North Carolina to Florida on or about January 20, 2006, or at least before February 3, 2006; and (2) if so, whether Petitioners are entitled to attorneys' fees in addition to other relief because Respondent acted without substantial justification, and because no special circumstances make such an award unjust.

## V.    LEGAL PRINCIPLES

{14}    North Carolina by statute defines a resident, for tax purposes, as:

> [a]n individual who is domiciled in this State at any time during the taxable year or who resides in this State during the taxable year for other than a temporary or transitory purpose. In the absence of convincing proof to the contrary, an individual who is present within the State for more than 183 days during the taxable year is presumed to be a resident, but the absence of an individual from the state for more than 183 days raises no presumption that the individual is not a resident. A resident who removes from the State during a taxable year is considered a resident until he has both established a definite domicile elsewhere and abandoned any domicile in this State. . . .

N.C. Gen. Stat. § 105-134.1(12) (2013), *recodified at* N.C. Gen. Stat. § 105-153.3 (eff. Jan. 1, 2014).

{15}    The North Carolina Administrative Code (the "Code") further defines a "nonresident" as an individual "[w]ho resides in North Carolina for a temporary or transitory purpose and is, in fact, a domiciliary resident of another state or country[.]"  17 N.C. Admin. Code 06B.3902(a) (2013).  The Code defines domicile as "the place where an individual has a true, fixed permanent home and principal establishment, and to which place, whenever absent, the individual has the intention of returning."  17 N.C. Admin. Code 06B.3901(a).  "A mere intent or desire to make a change in domicile is not enough; voluntary and positive action must be taken."  *Id.*

{16}    "Residence" and "domicile" are not interchangeable terms.  *See In re Leonard*, 77 N.C. App. 439, 440, 335 S.E.2d 73, 74 (1985).  Generally, "'residence' indicates the person's actual place of abode, whether permanent or temporary, and 'domicile' indicates the person's permanent home to which, when absent, he intends to return.  Residence is a prerequisite to establishing a domicile, and not vice versa."  *Id.* at 440, 335 S.E.2d at 74 (citing *Hall v. Wake Cnty. Bd. of Elections*, 280 N.C. 600, 187 S.E.2d 52 (1972)).

{17}    A person can have only one domicile.  *Reynolds v. Lloyd Cotton Mills*, 177 N.C. 412, 422, 99 S.E. 240, 245 (1919).  The "law permits no individual to be without a domicile."  *Hall*, 280 N.C. at 608, 187 S.E.2d at 57.  Abandoning one domicile does not, by itself, result in a change of domicile until the person acquires a new domicile elsewhere.  *See Reynolds*, 177 N.C. at 416, 99 S.E. at 242.

{18}    The Code provides a non-exclusive list of sixteen (16) factors to consider when determining a taxpayer's legal residence as follows:

> (1) Place of birth of the taxpayer, the taxpayer's spouse, and the taxpayer's children; (2) Permanent residence of the taxpayer's parents; (3) Family connections and close friends; (4) Address used for federal tax returns, military purposes, passports, driver's license, vehicle registrations, insurance policies, professional licenses or certificates, subscriptions for newspapers, magazines, and other publications, and monthly statements for credit cards, utilities, bank accounts, loans, insurance, or any other bill or item that requires a response; (5) Civic ties, such as church membership, club membership, or lodge membership; (6) Professional ties, such as licensure by a licensing

agency or membership in a business association; (7) Payment of state income taxes; (8) Place of employment or, if self-employed, place where business is conducted; (9) Location of healthcare providers, such as doctors, dentists, veterinarians, and pharmacists; (10) Voter registration and ballots cast, whether in person or by absentee ballot; (11) Occasional visits or spending one's leave "at home" if a member of the armed services; (12) Ownership of a home, insuring a home as a primary residence, or deferring gain on the sale of a home as a primary residence; (13) Location of pets; (14) Attendance of the taxpayer or the taxpayer's children at State supported colleges or universities on a basis of residence—taking advantage of lower tuition fees; (15) Location of activities for everyday "hometown" living, such as grocery shopping, haircuts, video rentals, dry cleaning, fueling vehicles, and automated banking transactions; (16) Utility usage, including electricity, gas, telecommunications, and cable television.

17 N.C. Admin. Code 06B.3901(b).

{19}   Actual residence at a new location cannot constitute a domicile without an intent to make that new location a permanent home. *Reynolds*, 177 N.C. at 419, 99 S.E. at 244. Intent to establish a new domicile is not enough without actually arriving at the new place and acquiring a home there. *Id.* at 422, 99 S.E. at 245–46. The shortness of time or the manner in which a person enjoys the new home does not defeat the acquisition of a new domicile as long as both actual residence and the intent of making the new residence a permanent home exist. *Id.* at 418, 99 S.E. at 243. Intent must be supported by a voluntary and positive action. 17 N.C. Admin. Code 06B.3901(a). The new residence acquired must be a true, fixed permanent home and principal establishment, and to which place, whenever absent, the individual intends to return. *Id.*

{20}   A true, fixed permanent home and principal establishment is an actual physical dwelling that a person intends to use as a home permanently as opposed to temporarily. *See Howard v. Queen City Coach Co.*, 212 N.C. 201, 203, 193 S.E. 138, 140 (1937) ("A place of [domicile] in the common-law acceptation of the term means a fixed and permanent abode, a dwelling place for the time being, as contradistinguished from a mere temporary local residence."); *Hall*, 280 N.C. at 605,

187 S.E.2d at 55 ("[A place of] [d]omicile denotes one's permanent, established home as distinguished from a temporary, although actual, place of residence.").

{21} The burden of proving that a change in domicile has occurred rests upon the person making the allegation. *Farnsworth v. Jones*, 114 N.C. App. 182, 187, 441 S.E.2d 597, 601 (1994) (quoting *Hall*, 280 N.C. at 608, 187 S.E.2d at 57).

{22} Determining domicile is a fact-intensive inquiry that depends on the particular facts of the case. *Hall*, 280 N.C. at 608, 187 S.E.2d at 56. There is no single determinative fact; rather, the decision requires consideration of all the facts and circumstances taken together. *Id.* at 609, 187 S.E.2d at 57. A person's testimony regarding his intention to change domiciles is competent, but not conclusive evidence. *Id.* A court must also consider all of the surrounding circumstances and conduct of the person in determining whether he or she has established a change in domicile. *Id.*

{23} "[T]he court may, in its discretion, allow the prevailing party to recover reasonable attorney's fees . . . if: (1) [t]he court finds that the agency acted without substantial justification in pressing its claim against the party; and (2) [t]he court finds that there are no special circumstances that would make the award of attorney's fees unjust." N.C. Gen. Stat. § 6-19.1 (2013).

## VI. FINDINGS OF FACT

{24} The court makes the following findings of fact based on the Official Record:

### A. The Parties

{25} Petitioners are a married couple who were domiciled in North Carolina at least until January 19, 2006, and for their entire lives before that date. They filed North Carolina tax returns for the 2005 tax year and for each year prior to 2005, but have asserted that they were non-residents during the 2006 and 2007 tax years.

{26} Respondent is the North Carolina Department of Revenue.

## B. Events prior to January 20, 2006

{27} In 1984, Mr. Fowler founded Commercial Grading, Inc. ("Commercial Grading"), a North Carolina company, which did business as "Fowler Contracting." Mr. Fowler devoted his time and effort to building Commercial Grading into a highly successful enterprise. He held the controlling majority interest in the company. Mrs. Fowler also worked at the company and dedicated substantial effort on its behalf.

{28} Petitioners began considering Florida as a potential retirement location as early as the 1990's.

{29} In 1999, while residing in Apex, North Carolina, Petitioners purchased property located at 7801 Old Stage Road, Raleigh, North Carolina. Petitioners initially considered building an 11,000 square-foot house on this property, but built a smaller 2,080 square-foot house, with two multi-bay garages of approximately 3,000 square feet each—one equipped with an office, car wash and dog wash— special kennels, and elaborate landscaping and gating. At the time Petitioners moved to the property, the property had an approximate value of $2.8 million. Once constructed, Petitioners considered this their true, fixed permanent home and principal establishment to which they intended to return when absent.

{30} Over several years, Petitioners visited numerous cities in Florida in search of real estate. In 2002, they purchased a three-bedroom, 3,400 square-foot house in Naples (the "Tiburon House") for approximately $1.6 million. In 2003, in connection with the move to their new Old Stage Road residence, Petitioners moved furniture to the Tiburon House, including some family heirlooms and valued furniture. At this time, the Tiburon House was Petitioners' secondary residence, which they did not consider their true, fixed permanent home and principal establishment to which they intended to return when absent.

{31} In 2004, Mr. Fowler was diagnosed with kidney cancer and underwent surgery to remove his kidney. Petitioners accelerated their efforts to sell Commercial Grading and retire to Florida.

{32}   In January 2005, Petitioners formed Fowler Aviation, Inc., a Florida company, to sell a new type of private jet.  They invested $1.775 million in the venture, but the money was fully refunded in 2006 when the FAA would not certify the jet for production and sale.

{33}   In early 2005, Petitioners engaged an investment-banking firm to solicit buyers for Commercial Grading.  They received and considered three bona fide offers.  In October 2005, Mr. Fowler signed a preliminary letter of intent ("Letter of Intent") with a private equity firm, Long Point Capital, to sell a majority of his shares in Commercial Grading.  Long Point was a "financial buyer," meaning that it intended to make a large cash infusion but was not itself experienced in Commercial Grading's line of business.  The transaction was then structured so that Mr. Fowler would sell his majority interest at a price determined by a negotiated company valuation, and he would retain a minority interest.  Mr. Fowler was further expected to remain the company's President, and Mrs. Fowler was also expected to remain with the company for a period after the sale.

{34}   After signing the Letter of Intent, Petitioners told various other acquaintances in both Florida and North Carolina of their intent to move to Florida.

{35}   Also, shortly after signing this Letter of Intent, Petitioners contracted to buy a four-bedroom, 9,300 square-foot house in Naples, Florida ("the Quail West House"), while retaining the Tiburon House.  They closed on their purchase in August 2006, but later sold the Quail West House in April 2009 without having lived in it.

{36}   In late 2005, Petitioners consulted their accountant, Graham Clements, to determine how to accomplish a change of domicile to Florida.  As part of this consultation, Mr. Clements informed Petitioners that if they became Florida residents prior to January 1, 2006, their holdings in Commercial Grading would be subject to Florida's intangibles tax.  Mr. Clements advised Petitioners to change their domicile to Florida after January 1, 2006, but before the close of the sale to Long Point, which would be a taxable event.  To effect the transfer, Mr. Clements advised Petitioners to own a home in Florida, hire a Florida attorney, file a

Declaration of Domicile in Florida, spend at least 183 days in Florida, and take some "official action," such as changing their driver's licenses and registering to vote.

{37} Also in late 2005, Mr. Fowler sought assistance from William Graef, a friend who owned an aviation company, for the purpose of buying, maintaining, and storing a private airplane. Petitioners contracted in early 2006 to purchase a plane from Mr. Graef for approximately $19.2 million. Petitioners and Mr. Graef unsuccessfully attempted to locate suitable hangar space with necessary services in Naples. They continued to charter private planes from Raleigh until the plane was delivered in Raleigh on October 2007, where it was registered and then stored. During this period, the predominant portion of the Fowlers' various travels were on flights originating in and returning to Raleigh.

{38} Lynnwood Mallard was Petitioners' counsel in connection with the sale of Commercial Grading. Mr. Mallard advised Mr. Fowler that Long Point would require Petitioners to continue working for Commercial Grading after the sale. The length and nature of the requirement became a significant point in negotiations for a sales agreement. Mr. Mallard obtained assurances that Mr. Fowler's work need not necessarily be on-site in North Carolina.

{39} On January 19, 2006, Petitioners signed the binding Securities Purchase Agreement for the sale of the majority interest in Commercial Grading. This event did not trigger taxes arising from the actual sale, which was set to occur in early February.

## C. Efforts on January 20, 2006

{40} On January 20, 2006, the Fowlers left for Naples, Florida, on a chartered plane for the purpose of taking "official action" to evidence their change of domicile. They tried but could not complete certain efforts on this trip because they left certain necessary papers in North Carolina. At the driver's license office, Petitioners presented their North Carolina licenses and asked for Florida driver's licenses, but were denied for lack of additional identification. They attempted but

were unable to register to vote for the same reason. At this time, Petitioners had one of their several automobiles in Florida. They registered that single car in Florida, but signed the registration form as non-residents, listing their North Carolina address. Petitioners also unsuccessfully attempted to obtain a post office box and register their dog on January 20, 2006.

{41} Petitioners stayed at the Tiburon House on this trip, which they contend had then become their true, fixed permanent home and principal establishment to which they intended to return when absent.

{42} On or about January 22, 2006, Petitioners returned to their Old Stage Road home, which they contend had then become their secondary home where they would reside on a temporary and transitory basis until and for the purpose of completing their ongoing obligations assumed under the sales transaction.

### D. Events Following the Sale of Commercial Grading, Including Continuing North Carolina Ties

{43} On February 3, 2006, Petitioners closed the sale of their majority interest in Commercial Grading to Long Point Capital for $106 million. Long Point wired approximately $70 million to Mr. Fowler's account with Wachovia Bank in North Carolina. Mr. Fowler retained a 32.6% ownership interest in the company.

{44} Mr. Fowler signed an Employment Agreement with Long Point on February 3, 2006, pursuant to which he was employed as President for a term of three years and responsible for managing day-to-day operations of the company. He remained employed until February 3, 2009. Mrs. Fowler also signed a three-year Employment Agreement on February 3, 2006, as Assistant Secretary, and remained employed until February 3, 2009. Efforts to hire a president to replace Mr. Fowler and assume his responsibilities earlier than his contract's expiration were unsuccessful.

{45} On February 8, 2006, Mr. Fowler made gifts to his brothers, Robert Fowler and Ricky Fowler, of $500,000 each. Mrs. Fowler also made gifts to Robert

and Ricky Fowler of $500,000 each. The gifts were made using checks showing the Fowlers' North Carolina address.

{46} Mrs. Fowler also made significant charitable contributions in North Carolina after February 3, 2006. She made a large contribution to the church her father attended before his death, which she indicated was in appreciation for that church's care for him prior to his death.

{47} Petitioners returned to Florida on March 10, 2006, and successfully completed the matters that they were unable to complete on their January 20, 2006, trip. They signed and filed a Declaration of Domicile in Florida. They obtained a Naples post office box and Florida driver's licenses, and they registered to vote. They have since voted in person in Florida elections. In August 2006, Petitioners advised the Wake County Board of Elections to remove them from the voting rolls of Wake County. They have not voted in North Carolina since January 20, 2006.

{48} In spring 2006, Petitioners hired Cooper Pulliam, an investment advisor in Atlanta, Georgia, to buy municipal bonds. Based on his understanding that Petitioners were Florida residents, Mr. Pulliam purchased a portfolio of municipal bonds from across the country. For the entire 2006 year, Petitioners further maintained their investment account with Wachovia Bank, which invested only in North Carolina state and municipal bonds through transactions totaling over $91 million.

{49} Petitioners traveled extensively after the sale, often to locations outside of either North Carolina or Florida. They spent substantial time in Myrtle Beach, South Carolina. Counting days, the Fowlers spent the most days in North Carolina in 2006 and 2007. Mr. Fowler testified that they did so because his duties as President required "face-to-face" meetings and "riding the jobs." In 2006, Mr. Fowler spent 162 and 51 days in North Carolina and Florida respectively. In 2007 he spent 168 and 27 days in North Carolina and Florida respectively. In 2006, Mrs. Fowler spent 173 and 47 days in North Carolina and Florida respectively. In 2007, she spent 180 and 27 days in North Carolina and Florida respectively. Neither Mr. Fowler nor Mrs. Fowler spent 183 days in North Carolina in either 2006 or 2007.

{50}    When in Raleigh, Petitioners stayed at their Old Stage Road home. They returned to their home in Naples on several occasions throughout 2006 and 2007.

{51}    Petitioners did not list their Old Stage Road house for sale in 2006. They testified that they were advised not to list the house because of the declining real estate market.  Ultimately, Petitioners listed the house on December 1, 2010, at $7.9 million.

{52}    Petitioners used their Florida address on their North Carolina Individual Income Tax Returns filed in April 2006 and thereafter.  Mrs. Fowler continued to use her North Carolina address on her Privilege License Tax Returns from 2006 through 2010, although the checks Mrs. Fowler used to pay the taxes due on her Privilege License Tax Returns displayed her Florida address.  Mrs. Fowler retained her North Carolina real estate license and received referral fees for properties in South Carolina and Florida, but never for property sold in North Carolina.  During 2006 and 2007, Mrs. Fowler completed her continuing education requirements in North Carolina.  Mrs. Fowler did not obtain a Florida real estate license.

{53}    Throughout 2006, the Fowlers changed their address from North Carolina to Florida with various businesses.  However, throughout 2006 and 2007, they also continued to use the Old Stage Road address in Raleigh for certain correspondence and billing, and on K-1s, 1099s, bills, and bank statements.

{54}    In 2006 and 2007, Mrs. Fowler went to church in both Naples and Raleigh.  While she indicates that she contributed to churches in Naples, the record reflects much more significant giving in North Carolina during this period. Petitioners donated cash and property to Westover United Methodist Church in Raleigh in the amounts of $102,580 and $24,985 in 2006 and 2007, respectively. During 2006 and 2007, Petitioners further donated to numerous other North Carolina charitable organizations.

{55}    In 2006 and 2007, Petitioners were members of the Tiburon Club and the Quail West Club in Florida, but of no club in North Carolina.  They obtained the

Quail West Club membership to make the Quail West property more attractive to prospective buyers.

{56} In 2006, Mr. Fowler used doctors in North Carolina and Massachusetts. In 2007, he used doctors in North Carolina, Massachusetts, and Florida. The majority of Petitioners' 2006 and 2007 medical expenses were for treatment at a Massachusetts facility associated with the Cleveland Clinic.

{57} In 2006 and 2007, the Fowlers did everyday "hometown" activities wherever they were.

{58} In 2006, the Fowlers hired Florida counsel to create their first estate plan. In 2006 and 2007, Mr. Fowler obtained legal services from at least two North Carolina firms.

{59} In 2006 and 2007, Mr. Fowler served as the registered agent for several North Carolina business entities. On February 1, 2007, he established Buffaloe Country, LLC, as a North Carolina limited liability company, which held several North Carolina properties not associated with Commercial Grading. On March 12, 2007, Mr. Fowler incorporated and was the sole owner of Leesville Road Ventures, LLC, a North Carolina limited liability company. Mr. Fowler used his Florida address when organizing these companies.

{60} Petitioners bought a homeowners insurance policy for their home at 7801 Old Stage Road in Raleigh for the period of July 31, 2006, through July 31, 2007. The policy included the stipulation that "The described dwelling is not seasonal or secondary." The Fowlers insured the contents of the Old Stage Road property for $371,000. They did not insure their Florida property.

{61} The Fowlers donated to candidates running for office in North Carolina but did not contribute to Florida candidates. Mr. Fowler testified that each contribution was tied to candidates whose efforts benefitted business holdings.

{62} Petitioners held an elaborate birthday party for Mr. Fowler in North Carolina at the Old Stage Road property at a cost approximating $1.3 million, to which customers and employees were invited.

### E. Assessment and Calculation of Taxes

{63}  In its Final Agency Decision, the Department calculates the taxes, penalties, and interest as follows:

Individual Income Tax – Petitioners

| | |
|---|---|
| Tax | $ 6,325,106.00 |
| Penalty | $ 1,581,276.50 |
| Interest | $ 2,138,925.56 |
| Total Due as of July 17, 2013 | $10,047,039.78 |

Plus daily interest which accrues at the rate of $865.86 per day.

Gift Tax – Steve Fowler

| | |
|---|---|
| Tax | $ 96,560.00 |
| Penalty | $ 57,936.00 |
| Interest | $ 33,159.53 |
| Total Due as of July 17, 2013 | $ 187,681.97 |

Plus daily interest which accrues at the rate of $13.22 per day.

Gift Tax – Beth Fowler

| | |
|---|---|
| Tax | $ 118,180.00 |
| Penalty | $ 70,908.00 |
| Interest | $ 40,584.03 |
| Total Due as of July 17, 2013 | $ 229,704.39 |

Plus daily interest which accrues at the rate of $16.18 per day.

{64}  The court notes that the three Totals do not reflect the sum of the tax, penalty, and interest in each category.  The totals apparently include two additional days of interest.  The total of all taxes, interests, and penalties due on July 17, 2013 is $10,464,426.14.

{65}  On July 17, 2013, Petitioners paid Respondent $10,471,588.22.  (Pet. Judicial Review ¶ 9; Resp. Pet. Judicial Review ¶ 9.)  The difference between the amount paid and the amount due as stated in the Final Agency Decision is eight days' interest.

## F. Summary of Positions

{66} Although the determination of domicile may be based on a totality of circumstances, the Parties, in their respective briefs, emphasize certain facts.

{67} Caroline Krause-Iafrate ("Ms. Krause-Iafrate") was the Department's Lead Auditor for its Final Determination. Ms. Krause-Iafrate based her evaluation of the Fowlers' domicile on the "totality of facts and circumstances." She did not prepare a "scorecard" weighting the various factors that she considered.

{68} In its brief, Respondent catalogs particular actions or inactions it contends are inconsistent with the necessary intent in 2006 and 2007 not only to establish a domicile in Florida, but also to abandon the North Carolina domicile. The brief highlights the following: (a) the Fowlers continued to own and occupy their home in Raleigh and insure it as their primary residence; (b) the Fowlers spent more time in North Carolina than they did in Florida; (c) the Fowlers signed the three-year employment contract with Commercial Grading and continued to work in Raleigh; (d) Mr. Fowler had significant other business ventures in Raleigh; (e) the Fowlers traveled to and from Raleigh, North Carolina, more often than they did to and from Naples, Florida; (f) the Fowlers maintained and insured their plane and most of their cars (including a Porsche and a Ferrari) in Raleigh, North Carolina; (g) the Fowlers continued to use their Old Stage Road address on various documents such as their 1099s for tax years 2006 and 2007, the 2006 K-1 for Fowler Aviation issued to Mr. Fowler, Mrs. Fowler's 2006 and 2007 bank statements, invoices from the Fowlers' attorney, Mr. Mallard, from 2006 through 2008, the Fowlers' checks and credit card statements, and Mr. Fowler's Aircraft Registration Application in 2007 and related documents; (h) Mrs. Fowler maintained her North Carolina professional license and did not obtain a Florida license; (i) the Fowlers' "ministerial acts," such as obtaining Florida driver's licenses or registering to vote in Florida, did not occur until March 10, 2006, after the stock sale had closed and the gifts had been given to Mr. Fowler's brothers; (j) the Fowlers' pet dog, D8, stayed at Old Stage Road and received primary veterinary care in Raleigh; (k) the Fowlers continued to receive medical care in North Carolina, and made charitable

and political donations in North Carolina in 2006 and 2007, (l) the Fowlers had the elaborate birthday party at the Old Stage Road home in September 2006; and (m) the Fowlers did not effectively make Florida their new domicile by actually residing there or integrating themselves into their new community in a manner consistent with having a domicile in Florida. In sum, Respondent contends that Petitioners did no more than take limited actions in an effort to avoid taxation and that they never had the necessary intent to abandon and did not actually abandon their North Carolina domicile.

{69}    Petitioners, in their Petition and Brief, contend that the Department impermissibly failed to include in its Final Determination facts that demonstrate the necessary intent coupled with voluntary and positive action adequate to effectuate the change in domicile, and which facts also explain that Petitioners' continued activities in North Carolina were only in connection with their temporary and transitory obligations assumed as a part of their sale to Long Point Capital. These facts include: (a) the Fowlers visited government offices in Florida on January 20, 2006, and registered a car in Florida; (b) the Fowlers kept working for Commercial Grading because Long Point required it; (c) the Fowlers used their Raleigh property during the Department's audit period only to fulfill their contractual obligations with Long Point; (d) Mrs. Fowler did not obtain a Florida real estate license because she could still receive referral fees without one; (e) Mrs. Fowler never sold real estate in North Carolina; (f) the Ernst & Young entrepreneur's award Fowler received in April 2006 was for his performance prior to 2006; (g) the Fowlers gave money to a church in North Carolina because the church members had been kind to Mrs. Fowler's late father in his final years; (h) the Fowlers contributed money to candidates in Wake County elections who had helped the Fowlers' business; (i) the Fowlers kept some cars in North Carolina because their Florida home had limited garage space; (j) the Fowlers stored their airplane in North Carolina because of their relationship with Mr. Graef and his company; (k) the Fowlers used doctors in North Carolina (in addition to doctors in other states) based on confidence and long-standing relationships arising from life-threatening

circumstances; and (l) the Fowlers' two dogs in Raleigh were guard dogs that protected their isolated house, rather than pets like D8, the dog they took with them when traveling or in Florida. In sum, Petitioners contend the overall record demonstrates that they met their burden of demonstrating a change in domicile by establishing a new domicile in Florida and abandoning their domicile in North Carolina.

## VII.   CONCLUSIONS OF LAW

{70}   Based on the above findings of fact, applying the governing legal principles, the court makes the following conclusions of law:

{71}   The Fowlers can have but one domicile. The Fowlers intended to change and did change their domicile from North Carolina to Florida effective as of January 20, 2006, effecting an intent that preceded that date.

{72}   The Fowlers took adequate voluntary and positive actions in Florida on January 20, 2006 to establish their new domicile. These intentional, voluntary, and positive actions were adequate, even though the Fowlers did not complete certain activities until the return trip on March 10, 2006.

{73}   On January 20, 2006, the Fowlers were present in Florida and intended to return there whenever absent thereafter. They owned and lived in the Tiberon House, a true, fixed permanent home and principal establishment to which they intended to return when absent.

{74}   On and after January 20, 2006, the Fowlers were North Carolina non-residents. On that date, they intended their home at Old Stage Road in Raleigh, North Carolina, to be their secondary home that they would no longer maintain as their permanent home. After January 20, 2006, they used this property as a temporary residence for the completion of temporary and transitory contractual obligations undertaken in connection with the sale of the majority interest in Commercial Grading.

{75}   On January 20, 2006, the Fowlers intended to abandon and did abandon North Carolina as their domicile.

{76}   The Fowlers were not required to remove all of their possessions and sever all ties with North Carolina to effect a change in domicile.  *Hall*, 280 N.C. at 610–11, 187 S.E.2d at 58.

{77}   The Fowlers' intent to change domicile was not improper or rendered ineffective because the change was timed to maximize tax savings.  Additionally, Mr. Fowler's unexpected medical condition accelerated the need to carry out a preexisting future intent for this change in domicile.

{78}   Conversely, the Fowlers were not in Florida for a temporary or transitory purpose on and after January 20, 2006.

{79}   Continued investments through the North Carolina Wachovia account, charitable and political contributions, maintaining personal property in North Carolina, and various other actions concerning North Carolina do not negate that Petitioners abandoned North Carolina as a domicile.

{80}   This case must be considered on its own unique facts.  Facts here are distinguishable from cases where activities in the claimed new domicile were temporary or transitory.  *See, e.g.*, *Farnsworth*, 114 N.C. App. at 188, 441 S.E.2d at 602.  The decision in *Mauer v. Commissioner of Revenue*, 829 N.W.2d 59, 75 (Minn. 2013), is unpersuasive because its facts are distinct.

{81}   Any attempt to weigh the non-exclusive list of sixteen (16) factors in 17 N.C. Admin. Code 06B.3901(b) does not lead to a necessary finding that the Fowlers failed to abandon their domicile in North Carolina on January 20, 2006.  Under the facts of this case, four of the sixteen factors favor a North Carolina domicile (1, 3, 6 & 9), one favors a Florida domicile (10), six are neutral (4, 5, 12, 13, 15 & 16), two are beyond Petitioners' control (2 & 8), and three are inapplicable (7, 11, & 14).

{82}   The Fowlers have satisfied the three-part test for change of domicile established in *Farnsworth*.

{83}   Petitioners have satisfied their burden to prove a change of domicile to Florida as of January 20, 2006.

{84}   Respondent acted beyond its legal authority in imposing 2006 and 2007 income and gift taxes, together with penalties and interest on the Petitioners.

{85}    Petitioners are entitled to recover their taxes, penalties, and interest paid to Respondent for the tax years 2006 and 2007 together with interest at the legal rate from the date of payment to the date of refund.

{86}    Petitioners are not entitled to attorneys' fees.

{87}    The Department correctly recognized that a change of domicile must be determined from the totality of circumstances, and that a taxpayer claiming a change in domicile has the burden of proving such change by demonstrating both intent to establish a new domicile and to abandon the old one.  The court, after a thorough and careful review of the record, has accepted and found that the Fowlers' presence in North Carolina after January 20, 2006, was as non-residents for temporary and transitory purposes.  However, the record provided the Department with a substantial and reasonable basis to pursue its position that the Fowlers had not actually abandoned their domicile in North Carolina in 2006 or 2007.

{88}    The Department had substantial justification in pressing its claim against Petitioners.

{89}    The Department did not act without justification by failing to "score" each of the various factors leading to its decision.

{90}    An award of attorneys' fees against Respondent on the facts of this case would be unjust.

## VIII.  CONCLUSION

{91}    For the foregoing reasons, the Court REVERSES the Final Agency Decision of the Department of Revenue.  The Department shall refund the amounts the Fowlers paid to the Department under protest, together with interest at the legal rate from the date of that payment until refunded.

IT IS SO ORDERED, this 6th day of August, 2014.